# COMMISSIONER OF INTERNAL REVENUE *v.* BOLLINGER ET AL.

No. 86–1672.   Argued January 13, 1988—Decided March 22, 1988

SCALIA, J., delivered the opinion of the Court, in which all other Members joined, except KENNEDY, J., who took no part in the consideration or decision of the case.

*Alan I. Horowitz* argued the cause for petitioner. With him on the briefs were *Solicitor General Fried, Acting Assistant Attorney General Durney, Deputy Solicitor General Lauber, Richard Farber,* and *Teresa E. McLaughlin.*

*Charles R. Hembree* argued the cause for respondents. With him on the brief was *Philip E. Wilson.**

JUSTICE SCALIA delivered the opinion of the Court.

Petitioner, the Commissioner of Internal Revenue, challenges a decision by the United States Court of Appeals for the Sixth Circuit holding that a corporation which held record title to real property as agent for the corporation's shareholders was not the owner of the property for purposes of federal income taxation. 807 F. 2d 65 (1986). We granted certiorari, 482 U. S. 913 (1987), to resolve a conflict in the Courts of Appeals over the tax treatment of corporations purporting to be agents for their shareholders. Compare *George* v. *Commissioner,* 803 F. 2d 144, 148–149 (CA5 1986), cert. pending, No. 86–1152, with *Frink* v. *Commissioner,* 798 F. 2d 106, 109–110 (CA4 1986), cert. pending, No. 86–1151.

I

Respondent Jesse C. Bollinger, Jr., developed, either individually or in partnership with some or all of the other respondents, eight apartment complexes in Lexington, Ken-

*\*F. Kelleher Riess* filed a brief for Gary R. Frink et al. as *amici curiae* urging affirmance.

tucky. (For convenience we will refer to all the ventures as "partnerships.") Bollinger initiated development of the first apartment complex, Creekside North Apartments, in 1968. The Massachusetts Mutual Life Insurance Company agreed to provide permanent financing by lending $1,075,000 to "the corporate nominee of Jesse C. Bollinger, Jr." at an annual interest rate of eight percent, secured by a mortgage on the property and a personal guarantee from Bollinger. The loan commitment was structured in this fashion because Kentucky's usury law at the time limited the annual interest rate for noncorporate borrowers to seven percent. Ky. Rev. Stat. §§ 360.010, 360.025 (1972). Lenders willing to provide money only at higher rates required the nominal debtor and record titleholder of mortgaged property to be a corporate nominee of the true owner and borrower. On October 14, 1968, Bollinger incorporated Creekside, Inc., under the laws of Kentucky; he was the only stockholder. The next day, Bollinger and Creekside, Inc., entered into a written agreement which provided that the corporation would hold title to the apartment complex as Bollinger's agent for the sole purpose of securing financing, and would convey, assign, or encumber the property and disburse the proceeds thereof only as directed by Bollinger; that Creekside, Inc., had no obligation to maintain the property or assume any liability by reason of the execution of promissory notes or otherwise; and that Bollinger would indemnify and hold the corporation harmless from any liability it might sustain as his agent and nominee.

Having secured the commitment for permanent financing, Bollinger, acting through Creekside, Inc., borrowed the construction funds for the apartment complex from Citizens Fidelity Bank and Trust Company. Creekside, Inc., executed all necessary loan documents including the promissory note and mortgage, and transferred all loan proceeds to Bollinger's individual construction account. Bollinger acted as general contractor for the construction, hired the neces-

sary employees, and paid the expenses out of the construction account. When construction was completed, Bollinger obtained, again through Creekside, Inc., permanent financing from Massachusetts Mutual Life in accordance with the earlier loan commitment. These loan proceeds were used to pay off the Citizens Fidelity construction loan. Bollinger hired a resident manager to rent the apartments, execute leases with tenants, collect and deposit the rents, and maintain operating records. The manager deposited all rental receipts into, and paid all operating expenses from, an operating account, which was first opened in the name of Creekside, Inc., but was later changed to "Creekside Apartments, a partnership." The operation of Creekside North Apartments generated losses for the taxable years 1969, 1971, 1972, 1973, and 1974, and ordinary income for the years 1970, 1975, 1976, and 1977. Throughout, the income and losses were reported by Bollinger on his individual income tax returns.

Following a substantially identical pattern, seven other apartment complexes were developed by respondents through seven separate partnerships. For each venture, a partnership executed a nominee agreement with Creekside, Inc., to obtain financing. (For one of the ventures, a different Kentucky corporation, Cloisters, Inc., in which Bollinger had a 50 percent interest, acted as the borrower and titleholder. For convenience, we will refer to both Creekside and Cloisters as "the corporation.") The corporation transferred the construction loan proceeds to the partnership's construction account, and the partnership hired a construction supervisor who oversaw construction. Upon completion of construction, each partnership actively managed its apartment complex, depositing all rental receipts into, and paying all expenses from, a separate partnership account for each apartment complex. The corporation had no assets, liabilities, employees, or bank accounts. In every case, the lenders regarded the partnership as the owner of the apartments

and were aware that the corporation was acting as agent of the partnership in holding record title. The partnerships reported the income and losses generated by the apartment complexes on their partnership tax returns, and respondents reported their distributive share of the partnership income and losses on their individual tax returns.

The Commissioner of Internal Revenue disallowed the losses reported by respondents, on the ground that the standards set out in *National Carbide Corp.* v. *Commissioner,* 336 U. S. 422 (1949), were not met. The Commissioner contended that *National Carbide* required a corporation to have an arm's-length relationship with its shareholders before it could be recognized as their agent. Although not all respondents were shareholders of the corporation, the Commissioner took the position that the funds the partnerships disbursed to pay expenses should be deemed contributions to the corporation's capital, thereby making all respondents constructive stockholders. Since, in the Commissioner's view, the corporation rather than its shareholders owned the real estate, any losses sustained by the ventures were attributable to the corporation and not respondents. Respondents sought a redetermination in the United States Tax Court. The Tax Court held that the corporation was the agent of the partnerships and should be disregarded for tax purposes. 48 TCM 1443 (1984), ¶84, 560 P-H Memo TC. On appeal, the United States Court of Appeals for the Sixth Circuit affirmed. 807 F. 2d 65 (1986). We granted the Commissioner's petition for certiorari.

## II

For federal income tax purposes, gain or loss from the sale or use of property is attributable to the owner of the property. See *Helvering* v. *Horst,* 311 U. S. 112, 116–117 (1940); *Blair* v. *Commissioner,* 300 U. S. 5, 12 (1937); see also *Commissioner* v. *Sunnen,* 333 U. S. 591, 604 (1948). The prob-

lem we face here is that two different taxpayers can plausibly be regarded as the owner. Neither the Internal Revenue Code nor the regulations promulgated by the Secretary of the Treasury provide significant guidance as to which should be selected. It is common ground between the parties, however, that if a corporation holds title to property as agent for a partnership, then for tax purposes the partnership and not the corporation is the owner. Given agreement on that premise, one would suppose that there would be agreement upon the conclusion as well. For each of respondents' apartment complexes, an agency agreement expressly provided that the corporation would "hold such property as nominee and agent for" the partnership, App. to Pet. for Cert. 21a, n. 4, and that the partnership would have sole control of and responsibility for the apartment complex. The partnership in each instance was identified as the principal and owner of the property during financing, construction, and operation. The lenders, contractors, managers, employees, and tenants — all who had contact with the development — knew that the corporation was merely the agent of the partnership, if they knew of the existence of the corporation at all. In each instance the relationship between the corporation and the partnership was, in both form and substance, an agency with the partnership as principal.

The Commissioner contends, however, that the normal indicia of agency cannot suffice for tax purposes when, as here, the alleged principals are the controlling shareholders of the alleged agent corporation. That, it asserts, would undermine the principle of *Moline Properties* v. *Commissioner*, 319 U. S. 436 (1943), which held that a corporation is a separate taxable entity even if it has only one shareholder who exercises total control over its affairs. Obviously, *Moline*'s separate-entity principle would be significantly compromised if shareholders of closely held corporations could, by clothing the corporation with some attributes of agency with respect

to particular assets, leave themselves free at the end of the tax year to make a claim—perhaps even a good-faith claim— of either agent or owner status, depending upon which choice turns out to minimize their tax liability. The Commissioner does not have the resources to audit and litigate the many cases in which agency status could be thought debatable. Hence, the Commissioner argues, in this shareholder context he can reasonably demand that the taxpayer meet a prophylactically clear test of agency.

We agree with that principle, but the question remains whether the test the Commissioner proposes is appropriate. The parties have debated at length the significance of our opinion in *National Carbide Corp.* v. *Commissioner, supra.* In that case, three corporations that were wholly owned subsidiaries of another corporation agreed to operate their production plants as "agents" for the parent, transferring to it all profits except for a nominal sum. The subsidiaries reported as gross income only this sum, but the Commissioner concluded that they should be taxed on the entirety of the profits because they were not really agents. We agreed, reasoning first, that the mere fact of the parent's control over the subsidiaries did not establish the existence of an agency, since such control is typical of all shareholder-corporation relationships, *id.,* at 429–434; and second, that the agreements to pay the parent all profits above a nominal amount were not determinative since income must be taxed to those who actually earn it without regard to anticipatory assignment, *id.,* at 435–436. We acknowledged, however, that there was such a thing as "a true corporate agent . . . of [an] owner-principal," *id.,* at 437, and proceeded to set forth four indicia and two requirements of such status, the sum of which has become known in the lore of federal income tax law as the "six *National Carbide* factors":

"[1] Whether the corporation operates in the name and for the account of the principal, [2] binds the principal by

its actions, [3] transmits money received to the principal, and [4] whether receipt of income is attributable to the services of employees of the principal and to assets belonging to the principal are some of the relevant considerations in determining whether a true agency exists. [5] If the corporation is a true agent, its relations with its principal must not be dependent upon the fact that it is owned by the principal, if such is the case. [6] Its business purpose must be the carrying on of the normal duties of an agent." *Ibid.* (footnotes omitted).

We readily discerned that these factors led to a conclusion of nonagency in *National Carbide* itself. There each subsidiary had represented to its customers that it (not the parent) was the company manufacturing and selling its products; each had sought to shield the parent from service of legal process; and the operations had used thousands of the subsidiaries' employees and nearly $20 million worth of property and equipment listed as assets on the subsidiaries' books. *Id.*, at 425, 434, 438, and n. 21.

The Commissioner contends that the last two *National Carbide* factors are not satisfied in the present case. To take the last first: The Commissioner argues that here the corporation's business purpose with respect to the property at issue was not "the carrying on of the normal duties of an agent," since it was acting not as the agent but rather as the owner of the property for purposes of Kentucky's usury law. We do not agree. It assuredly was not acting as the owner in fact, since respondents represented themselves as the principals to all parties concerned with the loans. Indeed, it was the lenders themselves who required the use of a corporate nominee. Nor does it make any sense to adopt a contrary-to-fact legal presumption that the corporation was the principal, imposing a federal tax sanction for the apparent evasion of Kentucky's usury law. To begin with, the Commissioner has not established that these transactions

were an evasion. Respondents assert without contradiction that use of agency arrangements in order to permit higher interest was common practice, and it is by no means clear that the practice violated the spirit of the Kentucky law, much less its letter. It might well be thought that the borrower does not generally require usury protection in a transaction sophisticated enough to employ a corporate agent—assuredly not the normal *modus operandi* of the loan shark. That the statute positively envisioned corporate nominees is suggested by a provision which forbids charging the higher corporate interest rates "to a corporation, the principal asset of which shall be the ownership of a one (1) or two (2) family dwelling," Ky. Rev. Stat. § 360.025(2) (1987)—which would seem to prevent use of the nominee device for ordinary home-mortgage loans. In any event, even if the transaction did run afoul of the usury law, Kentucky, like most States, regards only the lender as the usurer, and the borrower as the victim. See Ky. Rev. Stat. § 360.020 (1987) (lender liable to borrower for civil penalty), § 360.990 (lender guilty of misdemeanor). Since the Kentucky statute imposed no penalties upon the borrower for allowing himself to be victimized, nor treated him as *in pari delicto*, but to the contrary enabled him to pay back the principal without any interest, and to sue for double the amount of interest already paid (plus attorney's fees), see Ky. Rev. Stat. § 360.020 (1972), the United States would hardly be vindicating Kentucky law by depriving the usury victim of tax advantages he would otherwise enjoy. In sum, we see no basis in either fact or policy for holding that the corporation was the principal because of the nature of its participation in the loans.

Of more general importance is the Commissioner's contention that the arrangements here violate the fifth *National Carbide* factor—that the corporate agent's "relations with its principal must not be dependent upon the fact that it is owned by the principal." The Commissioner asserts that

this cannot be satisfied unless the corporate agent and its shareholder principal have an "arm's-length relationship" that includes the payment of a fee for agency services. The meaning of *National Carbide*'s fifth factor is, at the risk of understatement, not entirely clear. Ultimately, the relations between a corporate agent and its owner-principal are *always* dependent upon the fact of ownership, in that the owner can cause the relations to be altered or terminated at any time. Plainly that is not what was meant, since on that interpretation all subsidiary-parent agencies would be invalid for tax purposes, a position which the *National Carbide* opinion specifically disavowed. We think the fifth *National Carbide* factor—so much more abstract than the others—was no more and no less than a generalized statement of the concern, expressed earlier in our own discussion, that the separate-entity doctrine of *Moline* not be subverted.

In any case, we decline to parse the text of *National Carbide* as though that were itself the governing statute. As noted earlier, it is uncontested that the law attributes tax consequences of property held by a genuine agent to the principal; and we agree that it is reasonable for the Commissioner to demand unequivocal evidence of genuineness in the corporation-shareholder context, in order to prevent evasion of *Moline*. We see no basis, however, for holding that unequivocal evidence can only consist of the rigid requirements (arm's-length dealing plus agency fee) that the Commissioner suggests. Neither of those is demanded by the law of agency, which permits agents to be unpaid family members, friends, or associates. See Restatement (Second) of Agency §§ 16, 21, 22 (1958). It seems to us that the genuineness of the agency relationship is adequately assured, and tax-avoiding manipulation adequately avoided, when the fact that the corporation is acting as agent for its shareholders with respect to a particular asset is set forth in a written agreement at the time the asset is acquired, the corporation

functions as agent and not principal with respect to the asset for all purposes, and the corporation is held out as the agent and not principal in all dealings with third parties relating to the asset. Since these requirements were met here, the judgment of the Court of Appeals is

*Affirmed.*

JUSTICE KENNEDY took no part in the consideration or decision of this case.