**COMMISSIONER OF INTERNAL REVENUE, Petitioner–Cross–Respondent,**

v.

**Leon E. HENDRICKSON, Respondent–Cross–Petitioner,**

and

**Peoples Loan & Trust Company, Cross–Petitioner.**

Nos. 88–1208, 88–1209, 88–1421, 88–1422.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 5, 1989.

Decided April 27, 1989.

---

Marc A. Hetzner, Kreig Devault Alexander & Capehart, Indianapolis, Ind., for petitioner-cross-respondent.

Bruce R. Ellisen, Tax Div., Dept. of Justice, Washington, D.C., for respondent-cross-petitioner.

Before POSNER, COFFEY, and KANNE, Circuit Judges.

POSNER, Circuit Judge.

When the Internal Revenue Service believes that a taxpayer intends to leave (or remove his property from) the country, conceal himself or his property, become insolvent, or do or suffer anything else that might thwart efforts to collect taxes due from him, it can make an immediate determination of his tax liability—that is, without waiting until the end of the taxpayer's tax year—and demand immediate payment of the taxes due. 26 U.S.C. § 6851(a)(1). These are "termination assessments." Similarly, when the Service believes that collection of a tax deficiency would be jeopardized by delay, it can demand that the taxpayer pay the deficiency immediately. 26 U.S.C. § 6861(a). These are "jeopardy assessments." The difference between the two types of assessment

is merely that the first comes into play before the taxpayer's tax return is due, and the second after.

The Service's power to make termination and jeopardy assessments was strengthened by a Draconian measure that Congress enacted in 1982: if an "individual who is in physical possession of cash [or cash equivalents, as defined by regulation] in excess of $10,000 does not claim such cash," either as his own or "as belonging to another person whose identity the [Internal Revenue Service] can readily ascertain and who acknowledges the ownership of such cash," then for purposes of the termination and jeopardy assessment statutes "it shall be presumed that such cash represents gross income of a single individual [namely, the possessor] for the taxable year in which the possession occurs, and that the collection of tax will be jeopardized by delay." 26 U.S.C. §§ 6867(a), (b)(3), (d)(2). The gross income imputed to the possessor is taxable at a 50 percent rate. 26 U.S.C. § 6867(b)(2).

The thinking behind section 6867 is plain enough, with or without recourse to the legislative history. An individual (the statute does not apply to corporations) who holds a large amount of cash or its equivalent without claiming to be the owner, or being able to demonstrate who the owner is, probably is trying to conceal the receipt of illegal income (whether his own, or a principal's) from law enforcement authorities, including the Internal Revenue Service. The statute forces the owner to either 'fess up or kiss half his money goodbye. See H.R.Conf.Rep. No. 760, 97th Cong., 2d Sess. 580–83 (1982), U.S.Code Cong. & Admin.News 1982, pp. 781, 1352–55.

 The remedies against a wrongful assessment under section 6867 vary depending on whether the person seeking the remedy is, on the one hand, the possessor of the cash or cash equivalent himself or, on the other hand, someone claiming to be the owner. The possessor can, like any other taxpayer against whom a deficiency is assessed, either contest the deficiency (i.e., the determination by the Internal Rev-

enue Service that a 50 percent tax on the funds in the possessor's custody is due) in the Tax Court, as Peoples and Hendrickson did, or pay the deficiency and bring a suit for refund in federal district court. The person claiming to be the true owner can, utilizing procedures liberalized in 1976, see *Hiley v. United States*, 807 F.2d 623, 626–27 (7th Cir.1986), bring a suit in district court to challenge the assessment, see 26 U.S.C. § 7429, posting a bond to stay collection pending the challenge (see § 6863(a)) and recovering his attorney's fees and other costs of suit if he wins (see § 7430). If the government has already succeeded in collecting the tax out of the possessor's cash (or cash equivalent), the true owner can bring a suit for wrongful levy under § 7426. These remedies are not available to the possessor. *Robrish v. United States*, 579 F.Supp. 477 (D.Mass. 1983); see also 26 U.S.C. § 6867(b)(3). If in the course of any of these proceedings it turns out that the possessor was indeed not the owner, the government can substitute the true owner for the possessor in the termination or jeopardy assessment proceeding and issue a new deficiency notice to that owner, all with relation back to the date of the original assessment under section 6867 so that the government is not faced by a statute of limitations problem. See 26 U.S.C. § 6867(c).

The present case arises out of the death in October 1983 of Larry Dale Martin, a Colorado "banker" to tax protesters. (On the tax-protester movement generally, see, e.g., *Miller v. United States*, 868 F.2d 236 (7th Cir.1989) (per curiam); *Coleman v. Commissioner*, 791 F.2d 68 (7th Cir.1986).) Under the name of the National Commodity Exchange and later the National Commodities Exchange Association, Martin offered to buy gold and silver coins and bullion for the accounts of persons distrustful of Federal Reserve notes and desiring maximum privacy in their financial dealings, and also to convert gold and silver in the depositors' accounts into paper money and at the depositor's direction pay his bills with the paper money. The agreements with the depositors stated that in buying gold and silver for their accounts and in

paying their bills Martin was "acting only as an agent for the above specific purpose[s] and no other." The agreements also contained Martin's pledge not to divulge any information about the agency accounts.

Martin had extensive dealings with Leon Hendrickson, the sole proprietor of a company called Silver Towne. Located in Winchester, Indiana, Silver Towne trades gold and silver coins and bullion on a large scale and has large and heavily guarded vaults for the safe storage of precious metals. Martin not only bought gold and silver from Hendrickson and sold gold and silver to him when he needed Federal Reserve notes to pay depositors' bills, but also stored in Silver Towne's vaults some of the coins and bullion that he was holding for the accounts of his depositors. At the time of Martin's death Hendrickson was storing almost $3.7 million in coins, bullion, and cash for him.

Shortly before his death Martin had borrowed $150,000 from the Peoples Loan & Trust Company of Winchester, and to secure the loan had given the bank a security interest in 25 bags of silver coins. At the time of his death the bank was holding the 25 bags in its vaults plus the cash balance of Martin's account with the bank. The combined value of the silver and the cash exceeded $226,000. A month after Martin's death an Indiana state court, at the request of Peoples, appointed the bank to be the administrator of Martin's estate in Indiana. Lacking facilities for safe storage of all the cash and precious metals in the estate, Peoples made a storage contract with Hendrickson continuing his custody of the cash and precious metals that he had been storing for Martin.

More than five years have passed since the appointment of Peoples as the administrator of Martin's Indiana estate, and the estate has not yet been wound up. Roughly 400 persons have filed claims against it. These persons claim to be depositors in Martin's "bank," and they say that the cash and precious metals that Peoples and Hendrickson are holding really belong to them. The total claimed exceeds the amount held by Peoples and Hendrickson. Other lawsuits involving the estate are pending, but they are not directly relevant to the issues in the present case, although in one of them the Internal Revenue Service succeeded in enjoining the probate proceeding while the tax issues in the present case are straightened out.

In the spring of 1984 the Service made assessments against Peoples and Hendrickson under section 6867. Shortly afterward it sent them deficiency notices, having assessed on each of the two possessors a deficiency for 1983 equal to one-half of the value of the cash and precious metals held by them on Martin's account. (There is no dispute that the gold and silver coins and bullion are cash equivalents within the meaning of the statute and the applicable regulation. See 26 C.F.R. § 301.6867–IT.) Peoples and Hendrickson contested the deficiencies in the Tax Court. Both had claimed that the cash belonged to Martin's estate, and Peoples, in its capacity as administrator of the estate, had expressly acknowledged to Hendrickson that Martin's estate was the owner. The Tax Court, in a 14–3 decision, accepted the argument and held that one of the prerequisites to applying section 6867—that the possessor not have claimed that the cash or cash equivalents "belong[ed] to another person whose identity the [Internal Revenue Service] can readily ascertain and who acknowledges ownership of such cash [or equivalent]"—had not been satisfied. The court then dismissed the suit as outside its jurisdiction. 89 T.C. 896 (1987).

The correctness of the Tax Court's interpretation of the statutory term "acknowledges ownership"—the only issue on this appeal—is a pure matter of law, on which we owe no special deference to the Tax Court's view. See *Vukasovich, Inc. v. Commissioner*, 790 F.2d 1409, 1411–13 (9th Cir.1986); *Merit Life Ins. Co. v. Commissioner*, 853 F.2d 1435, 1438 (7th Cir.1988). The Tax Court's findings of fact and its applications of law to facts we must review under the clearly-erroneous standard. See *Yosha v. Commissioner*, 861 F.2d 494, 499 (7th Cir.1988), and cases cited there.

The government has appealed only with regard to Hendrickson. No one had noticed during the Tax Court proceedings —not even the judges of the Tax Court— that the statute was inapplicable to Peoples Loan & Trust Company, because it is a corporation rather than an individual and the statute in terms applies only to individuals. The Solicitor General noticed this when the Internal Revenue Service asked him to authorize the appeal, and he therefore authorized the appeal only as to Hendrickson. Peoples, joined by Hendrickson, has cross-appealed from the Tax Court's decision, arguing that the Tax Court should not have dismissed the suit for lack of jurisdiction. This manner of disposition, by depriving the Tax Court's statutory interpretation of any preclusive (res judicata or collateral estoppel) effect in subsequent litigation, leaves the government free, in theory at least, to issue a new notice of deficiency and litigate the validity of its interpretation of the statute anew. The government agrees that the Tax Court should not have cast its action in jurisdictional terms. This is certainly right. The Tax Court held the notice of deficiency invalid because the Internal Revenue Service had exceeded its authority. That was a ruling on the merits. There was no defect in the Tax Court's jurisdiction.

The concrete issue presented by the government's appeal—one of first impression—is whether an agent's acknowledgement of ownership satisfies the statutory requirement. The government argues that since it was only in his agent capacity that Martin received the funds he converted into the gold and silver that he stored with and that remain in the possession of Hendrickson, Martin never owned—and his estate does not now own—the funds, and therefore his administrator's acknowledgment of ownership of the funds is phony; and the statute should not be interpreted to allow a phony acknowledgment to defeat the government's rights. Moreover, the acknowledgment was made by Peoples in its capacity as the administrator of Martin's estate, and Peoples had a conflict of interest. As a possessor of the funds (which it thought it was, because this was

before anyone noticed that the statute was inapplicable to corporations), it would lose half its security interest unless someone else acknowledged ownership. So it used its power as administrator to have Martin's estate make the acknowledgment.

To all this Hendrickson replies that an agent can also be an owner. A bank (and Martin was running an informal bank) is an agent of its depositors, but it is the owner rather than merely the custodian of the funds placed on deposit. The deposit creates a debtor-creditor relationship; the bank is the debtor, the depositor the creditor. As Martin's successor, Martin's estate really is the owner of the property stored in Hendrickson's vaults, and Peoples' acknowledgment of Martin's ownership therefore was not phony. The Internal Revenue Service is not without remedy. If the Service suspects that all or some of the deposits made in Martin's "bank" came from income that the depositors were trying to conceal, it can investigate the depositors, who have revealed their names to the world by filing claims with the Indiana state court that is probating Martin's estate.

Hendrickson and the Tax Court have committed the common mistake of attempting to define a word without careful attention to its context; specifically, they have attempted to define the word "ownership" in 26 U.S.C. § 6867(a) without regard to the purpose of the statute. "Ownership" is a word of more than one meaning, and context determines which of its meanings is the relevant one in a particular case. Hendrickson, while asserting that Martin's estate is the owner of the cash and the gold and silver that Martin gave him for safekeeping, does not deny that the depositors on whose behalf Martin was acting have valid ownership claims against the estate. A bank "owns" the deposits made in it, in the sense of having legal title to them; the depositors are merely creditors of the bank in the amount of the deposits, as we have said. But there is a sense—albeit equitable rather than legal—in which it is the depositors who *really* "own" the deposits, for if the bank re-

fuses (without some contractual or other justification) to return the deposits on demand, the depositors can bring a suit to recover the amount of money that they deposited. The question whether for purposes of section 6867 the relevant owner(s) of the assets acquired by Martin for the accounts of his depositors is Martin's estate or the depositors themselves who have filed claims with the probate court is not answered by pointing out that Martin's estate holds the legal title.

■■■■ Section 6867 is a tax statute, and its aim is to put pressure on the true taxpayer to step forward. The true taxpayer is the person who has equitable ownership of the funds in question, and that means the depositors in a bank rather than the bank itself, which merely has legal title. Tax liability turns on equitable rather than legal ownership. See, e.g., *Estate of Whitt v. Commissioner*, 751 F.2d 1548, 1556 (11th Cir.1985). None of the parties suggests that the money Martin received to buy gold and silver on behalf of the payors was income to him, although it may have been income to the payors that they were trying to conceal from the Internal Revenue Service by using a banker pledged to secrecy—a pledge that Martin had redeemed early in 1983 by spending 52 days in jail for contempt of court for refusing to divulge the records of his banking operation. A bailee is not a beneficial owner subject to income tax on the property that he holds for the account of his bailor. 1 Bittker, Federal Taxation of Income, Estates and Gifts ¶ 6.1, at p. 6–2 (1981); see also 1 *id.*, ¶ 6.3.2, at p. 6–14. An agent is not the owner, for tax purposes, of moneys he receives on account of his principal. See, e.g., *Commissioner v. Bollinger*, 485 U.S. 340, 108 S.Ct. 1173, 99 L.Ed.2d 357 (1988). No more is a bank the owner *for tax purposes* of the deposits in it. The Internal Revenue Service gained nothing by the acknowledgment of ownership by Martin's estate. It has no claims against the estate in respect of money that Martin received as an agent. The relevant acknowledgment—the acknowledgement that would enable the Internal Revenue Service to track down the true taxpayers—is by

those who own the cash or cash equivalents *in the sense of ownership relevant to the tax laws*, i.e., the persons who have the potential tax liability. They are the persons who have filed claims in the probate proceeding, not the administrator of Martin's estate.

■■■■ Could the filing of the claims be the requisite acknowledgment of ownership? We think not. The other requirement in section 6867(a)(2), that the identity of the person to whom the cash or cash equivalents belong be readily ascertainable by the Internal Revenue Service, helps show why not. The true owners of the funds in Martin's estate cannot be determined until the probate proceeding is wound up, if only because the total of claims exceeds the total of funds available to pay them. A claim is not an acknowledgment. The claimants do not want to pay federal income tax on income that a court decides is not theirs. They are not prepared—at least as far as we can tell—to acknowledge ownership to the Internal Revenue Service until their ownership is confirmed in the probate proceeding.

■■■ Here is what should have happened, on the view we take of the statute, when Hendrickson received notice from the Internal Revenue Service that the Service was assessing a 50 percent tax on the cash and precious metals that he was holding as an agent of Martin's estate. He should have notified Peoples, as the administrator of Martin's estate, immediately. This was not merely a moral obligation; under the view we take of the statute, Hendrickson had a powerful incentive to notify Peoples immediately lest he find himself in a position where, having yielded up half the cash and precious metals he was holding on Martin's behalf to the Internal Revenue Service, he was asked for an accounting by Peoples and was compelled to admit that he was no longer in possession of half of the property entrusted to him. Hendrickson was just a bailee of this property. He owed his bailor, Peoples, a duty of care (see, e.g., *Refrigeration Sales Co. v. Mitchell–Jackson, Inc.*, 770 F.2d 98, 101

(7th Cir.1985)) that included a duty to keep track of the funds entrusted to him. Peoples in turn and for a similar reason had a powerful incentive to notify the claimants in the probate proceeding that the government had made an assessment on funds belonging to the estate, lest it be accused by them of having failed, as the estate's administrator, to preserve the assets of the estate for the equitable owners or beneficiaries. Once the claimants were notified that the Internal Revenue Service was demanding half the funds in Hendrickson's custody, they could contest the assessment by suing the government in federal district court under 26 U.S.C. §§ 7426 or 7429. To maintain such a suit or suits (in fact such a suit was brought, and is pending), they would have eventually to acknowledge their equitable ownership of the funds in Hendrickson's custody, and the Internal Revenue Service could then substitute them for Hendrickson in the assessment proceeding, as contemplated by section 6867(c). Perhaps the suits could be stayed pending completion of the probate proceeding, so that the plaintiffs would not have to acknowledge for tax purposes an ownership more extensive than the probate court might confirm.

What we have just sketched is what we believe to be the procedure contemplated by the statute in a case such as the present. The equitable owner must step forward to claim the funds in the possession of the section 6867 taxpayer. Otherwise proceedings under section 6867 will turn into shell games in which ownership is "acknowledged" by persons who turn out to be agents or straw men for still other persons, and so on indefinitely. Cf. *Matut v. Commissioner*, 858 F.2d 683, 687 (11th Cir.1988). That was not Congress's purpose in creating a defense for cases in which there is acknowledged ownership in someone other than the possessor. It is true that the Internal Revenue Service could have investigated the more than 400 claimants to the property in Martin's estate in an effort to determine which of them were in fact equitable owners of the estate and what the share of each was. But it was to eliminate the need for such cumber-

some investigatory proceedings against persons quite likely to be tax evaders that Congress enacted section 6867. The potential for abuse of so minatory a remedy is apparent, but the courts have adequate power in assessment and levy proceedings to protect the equitable owners. The government should be permitted to take its 50 percent provisional cut without becoming entangled in the probate proceeding. When that proceeding is completed, the true owners can get back whatever part of that 50 percent represents an overpayment of tax because they are in lower brackets or had already paid income tax on the money they deposited with Martin's "bank."

The judgment of the Tax Court is reversed and the case is remanded for further proceedings consistent with this opinion. A remand is necessary because the Tax Court, believing that the deficiency notices were invalid, did not reach Hendrickson's challenge to the details of the Internal Revenue Service's computation of the amount of tax due under the statute.

REVERSED AND REMANDED.