**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-1674
_____

MICHAEL TSEYTIN; ELLA TSEYTIN,
                                             Appellants

v.

COMMISSIONER OF INTERNAL REVENUE
_____

On Petition for Review of Order of the
United States Tax Court
(T.C. No. 354-12)
Tax Court Judge:  Hon. Stephen J. Swift
_____

Argued March 30, 2017
_____

Before:  VANASKIE, KRAUSE, and RESTREPO, *Circuit Judges*

(Opinion Filed:  August 18, 2017)
_____

Frank Agostino, Esq.
Lawrence A. Sannicandro, Jr., Esq.        [ARGUED]
Agostino & Associates
14 Washington Place
The Bank House
Hackensack, NJ  07601

       *Counsel for Appellants*

David A. Hubbert, Acting Assistant Attorney General
Regina S. Moriarty, Esq.                    [ARGUED]

Bridget M. Rowan, Esq.
United States Department of Justice
Tax Division
950 Pennsylvania Avenue, N.W.
P.O. Box 502
Washington, D.C.  20044

       *Counsel for Appellee*

_____

OPINION[*]

_____

VANASKIE, *Circuit Judge.*

This tax appeal raises the classic tax issue of form versus substance.  Appellant Michael Tseytin was the primary shareholder in a company that owned most of Russia's Pizza Huts and KFCs.  To sell the company, he bought out his minority shareholder and then transferred all the company's shares—including what he just purchased—to the buyer, an Eastern and Central European fast-food peer.  In effect, the deal meant Tseytin sold his majority stake and also acted as the go-between in the minority shareholder's sale of its shares.  But the IRS took the formalities of the deal literally, and taxed Tseytin on the gain attributable to all the shares, even the gain on the shares purchased from the minority shareholder.

Tseytin now argues he should not be taxed on stock he bought from the minority shareholder because he never owned it and acted merely as an agent, and alternatively, if

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

2

he must be taxed, he should be permitted to recognize losses. We find neither argument meritorious because Tseytin must bear the tax consequences of his business decisions, and Tseytin's two blocks of stock must be analyzed as separate units to give content to I.R.C. § 356. A limited remand, however, is warranted, because the parties agree that Appellant Ella Tseytin—Michael's wife—was held liable for her husband's tax bill in error. We will remand so that the error with respect to Ella may be corrected, but otherwise affirm.

## I.

This case centers on a two-company merger. The first company was Appellant Michael Tseytin's New Jersey corporation, U.S. Strategies, Inc. ("USSI"), whose business involved owning and operating two Russian LLCs that in turn owned and operated most of Russia's KFC and Pizza Hut restaurants. Tseytin owned 75% of USSI's shares. The remaining 25% were owned by a company named Archer Consulting Corporation.

On the other side of the merger was AmRest Holdings, NV, a Netherlands corporation also involved in the fast-food business. It owned KFCs, Pizza Huts, and other fast-food restaurants in Eastern Europe, Central Europe, Germany, France, and Spain.

In May 2007, all the relevant players substantively agreed to the merger in two separate written agreements. The first agreement was between Tseytin and Archer, wherein Tseytin agreed to "purchase" for his "own account" Archer's 25% stake in USSI. (App. 123, 125.) At closing on June 14 at Archer's offices in Moscow, Archer was to

3

transfer the shares to Tseytin, and then at some time in the next month Tseytin would make a "deferred" purchase payment to Archer, prior to July 31st. (App. 123.)

The second agreement, the Merger Agreement, was signed by Tseytin, USSI, and AmRest—but not Archer—and stated that at closing in Warsaw (1) Tseytin would ensure that he was the "record" owner of 100% of the USSI stock, "free and clear of any restrictions"; (2) Tseytin would transfer 100% of USSI's shares to AmRest; and (3) AmRest would transfer cash and AmRest stock to Tseytin as compensation. (App. 152.)

The transaction went through as planned. On June 14, Tseytin and Archer closed on their agreement and Archer transferred its USSI stock to Tseytin. On July 2, the USSI-AmRest merger closed, and Tseytin transferred all the USSI stock to AmRest. On July 3, AmRest sent Tseytin $23,099,420 in cash and $30,791,390 in AmRest stock, for a total of nearly $54 million for all USSI shares. Then on July 5, Tseytin paid Archer $14 million for its 25% stake in USSI.

In two tax filings for the 2007 tax year, Tseytin took two different approaches to the transaction. In his original return, Tseytin reported tax liability of $3,780,522 and paid that amount to the IRS. But in 2009 he amended his return and reported a lower amount of liability, $2,577,182, and requested a refund for the difference. The Commissioner audited Tseytin and found the original amount to be closer to correct. The Commissioner denied Tseytin's request for a refund and ordered Tseytin to pay $30,478 in back taxes and a $6,096 penalty. Tseytin then petitioned the Tax Court for a redetermination. The Tax Court held for the Commissioner, and Tseytin timely appealed.

4

## II.

The Tax Court had jurisdiction pursuant to 26 U.S.C. ("I.R.C.") § 6213 and § 7442. We have jurisdiction to review decisions of the Tax Court under I.R.C. § 7482(a)(1). We review the Tax Court's legal conclusions *de novo* and its factual findings for clear error. *Crispin v. Comm'r*, 708 F.3d 507, 514 (3d Cir. 2013).

## III.

Tseytin raises two main issues as to his tax liability: (1) whether he owes tax for income he allegedly derived from Archer's shares, and (2) whether his "losses" can be subtracted from his overall gains.

## A.

First, Tseytin challenges the Commissioner's determination that he must pay tax on the $14 million that he received from AmRest and remitted to Archer. The question is whether the form of the transaction makes Tseytin liable for a gain on the 25% share of USSI stock that had been held by Archer.

"[W]hile a taxpayer is free to organize his affairs as he chooses, . . . once having done so, he must accept the tax consequences of his choice, whether contemplated or not, and may not enjoy the benefit of some other route he might have chosen to follow but did not." *Comm'r v. Nat'l Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 149 (1974) (citations omitted). A taxpayer who falls within the scope of this rule—the "*Danielson* rule"—is stuck with the form of his business transaction, and can make an argument that substance should prevail over that form only if a limited class of exceptions applies, for

5

example, if the taxpayer was fraudulently induced into the deal, or there has been a material breach. *Comm'r v. Danielson*, 378 F.2d 771, 775 (3d Cir. 1967) (en banc).

Here, Tseytin argues he was never the substantive owner of the Archer block of stock and therefore should not be taxed on the $14 million portion of AmRest's payment that he passed to Archer. But none of the *Danielson* exceptions apply—Tseytin does not argue he was defrauded into the transaction, for example—and the contracts signed by the parties state in explicit terms that Tseytin acquired ownership of Archer's stock: he "purchase[d]" it for his "own account" prior to selling it to AmRest, and even though the shares were in his hands for only a brief period of time, he was the "record" owner, "free and clear of any restrictions." (App. 123, 125, 152.) These terms could hardly be clearer. Under *Danielson*, that is the end of the matter; no exception applies, the general rule governs, and Tseytin must bear the tax liability for owning all the USSI shares. Tseytin could have hypothetically structured the deal so that he never acquired formal ownership of Archer's shares. But he did not, and may not benefit from an alternative route now.

Tseytin puts forward four arguments in an attempt to escape this conclusion. First, he believes his argument about substantive ownership falls outside the scope of the *Danielson* rule because he is merely disputing how the contracts should be interpreted, and is not seeking to recharacterize the form of the exchange. Tseytin is correct that *Danielson*'s scope does not extend to a taxpayer's challenge to the Commissioner's interpretation of a contract. *Amerada Hess Corp. v. Comm'r*, 517 F.2d 75, 85-86 (3d Cir. 1975). In *Hess*, for example, the *Danielson* rule did not prohibit a taxpayer from challenging how a stock's fair-market value should be calculated under the terms of a

6

particular contract. *Id.* But even if Tseytin's argument could be characterized as involving contract interpretation, the contracts here are unambiguous: Tseytin bought Archer's stock for his own account, free and clear of any restrictions, and owned it prior to the sale to AmRest.

Second, Tseytin argues the *Danielson* rule should not apply because its background policies are not implicated. According to Tseytin, the *Danielson* rule's purpose is to prevent a taxpayer from having her cake and eating it too: a taxpayer must accept the bitter with the sweet and a deal's tax consequences with its business benefits. Tseytin sees this tax-fairness policy not implicated here because in his view he incurred no benefit from serving as Archer and AmRest's go-between—he never received any cake at all. This argument has at least two fatal flaws. For one, Tseytin likely did benefit. By structuring the merger so that he purchased Archer's stock for his own account prior to the sale to AmRest, Tseytin made the overall merger simpler by ensuring that AmRest could deal with only one party. Greater simplicity likely reduced the deal's transaction costs and litigation risk, increased the likelihood of the deal actually closing, and perhaps caused AmRest to pay a higher price than it otherwise may have. Second, even if Tseytin is right that the *Danielson* rule's background policies are not implicated here, that is of no consequence, because rules must generally be enforced independently of their underlying policies. That is after all the point of a bright-line rule like *Danielson*'s: its clear-cut nature requires that judges enforce it without wading into policy analysis, ensuring that the rule's application will be easy and predictable. *See* Kathleen M. Sullivan, *The Supreme Court, 1991 Term—Foreword: The Justices of Rules*

7

*and Standards*, 106 Harv. L. Rev. 22, 58-59 (1992) (comparing the relative advantages and disadvantages of bright-line rules and broader standards). Here, the *Danielson* rule's predictability would be eviscerated if we held, as Tseytin would have us hold, that its application actually depends on background tax-fairness policies. That would turn *Danielson's* bright-line rule into something other than a bright-line rule. Tseytin also argues the *Hess* case supports the proposition that the *Danielson* rule is already not enforced when it diverges from its underlying purposes. That is not what the *Hess* case held—as mentioned above, *Hess* did not purport to create new exceptions within *Danielson*'s scope; it held that the *Danielson* rule does not "determine[] the appellants' burdens" when the appellant "attack[s]" the Commissioner's interpretation of particular terms in a contract. *Hess*, 517 F.2d at 85-86, n.38.

Third, Tseytin makes an agency argument: he was nothing more than Archer's agent in selling Archer's block of stock, and agents are not liable for the tax burden of their principals. An agency relationship is created through "manifestation by the principal to the agent that the agent may act on his account" and the agent's "consent" to the undertaking. Restatement (Second) of Agency § 15 (Am. Law. Inst. 1958); *cf. Comm'r v. Bollinger*, 485 U.S. 340, 349 (1988) (citing the Restatement as persuasive authority for agency principles in a tax case). Here, Tseytin argues he and Archer had an agency relationship whereby his undertaking was to transfer Archer's shares to AmRest and remit to Archer the $14 million payment. The problem is that the best available evidence—the written agreement between Archer and Tseytin—strongly suggests there was no agency relation. The agreement states in straightforward terms that Tseytin

8

purchased Archer's shares for his own account. A gaping silence in the agreement says even more: the contract does not mention an agency relationship in form or substance, and none of the terms suggest Tseytin ever had an obligation to sell his newly-acquired shares to AmRest or anyone else; for all the contract cared, Tseytin could have kept the stock for as long as he wanted, as long as he paid Archer its $14 million. Tseytin did of course encumber himself with an obligation to sell the Archer shares, but that obligation was to USSI and AmRest, not Archer, and arose out of the separate Merger Agreement to which Archer was not a party. Tseytin's response is that a principal-agent relationship can be inferred by the parties' conduct, and more specifically Archer and Tseytin's informal agreement, made prior to the enactment of the two written agreements, to sell USSI through Tseytin. *See Nat'l Carbide Corp. v. Comm'r*, 336 U.S. 433, 436-38 (1949) (examining the conduct of two companies, using six factors, to determine the existence of a principal-agent relationship). But for us to rely on that pre-written-agreement conduct, we would have to ignore the fact that Tseytin and Archer integrated their agreements. Their written agreement, wholly lacking in any indication of an agency relation, states that it is "the entire agreement" and "supersedes all prior and contemporaneous oral or written agreements with regard to such subject matter." (App. 126); *see also* Restatement (Second) of Contracts § 209, cmt. a (Am. Law Inst. 1981) ("An integrated agreement supersedes contrary prior statements").

Finally, Tseytin argues his case can be saved by New York contract law. In New York, a party may rescind a contract if (a) the party was induced to participate by fraud, or (b) there was a material breach. *Strand Bldg. Corp. v. Russell & Saxe, Inc.*, 232

9

N.Y.S.2d 384, 386 (N.Y. Super. Ct. 1962). Tseytin, however, cites this line of case law to go much further, arguing that at the time Tseytin transferred Archer's block of USSI shares to AmRest, Archer could have still hypothetically tried to rescind its contract with Tseytin, because Tseytin had not yet paid Archer the $14 million. Tseytin says this possibility of rescission means he only ever held "bare legal title" to Archer's shares, a property interest insufficient to bear the burden of taxation on the $14 million portion of AmRest's payment. Keeping in mind that nothing in the record indicates that Archer had a reason to justify a rescission, New York law does not go nearly as far as Tseytin would like it to: nothing in the *Strand* case discusses the property interest a person in Tseytin's shoes holds in his stock, whether it be "bare legal title" or something else, and *Strand* does not address any tax issues, federal or otherwise. The New York rescission issue is little more than a red herring.

In sum, Tseytin owned 100% of USSI's shares when he sold the company to AmRest for $54 million in aggregate compensation. He must shoulder the tax burden for the entire payment—even the portion associated with the $14 million he remitted to Archer.

**B.**

Tseytin next makes an argument in the alternative that if he must be taxed on the full $54 million from AmRest, he should be permitted to subtract from his gains on his original shares what he says he "lost" on the sale of the Archer shares.

The Tax Code imposes a general rule prohibiting the recognition of gains and losses incurred in a stock-for-stock corporate merger transaction. I.R.C. § 354(a); *see*

*also Comm'r v. Clark*, 489 U.S. 726, 729 (1985) (stating the Tax Code "imposes no current tax on certain stock-for-stock exchanges").[1]  But this general rule has an exception for instances when a corporate reorganization involves a transfer of stock in exchange for both stock *and* other property or money.  I.R.C. § 356.  In those transactions, *losses* still fall within the scope of the general rule—they may not be recognized—but *gains* must be recognized, unlike in the context of a typical stock-for-stock transaction.  *Id*. § 356(a), (c).[2]

---

[1] Pertinent here is the general rule provided in I.R.C. § 354(a)(1):  "No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan or reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization."

[2] Section 356(a) states in pertinent part:

Recognition of gain:  If—

(A) section 354 or 355 would apply to an exchange but for the fact that

(B) the property received in the exchange consists not only of property permitted by section 354 or 355 to be received without the recognition of gain but also of other property or money,

then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.

I.R.C. § 356(a)(1).

Section 356(c) states,

Loss:  If—

(1) section 354 would apply to an exchange or section 355 would apply to an exchange or distribution, but for the fact that

11

To give content to § 354 and § 356, the Commissioner analyzes multifaceted transactions according to their separate units, so that a taxpayer may not end-run the no-recognition-of-losses rule by tucking one unit's unrecognizable loss under the transaction's broader recognizable gain. For example, in *Lakeside Irrigation Co. v. Commissioner*, an irrigation company sold four blocks of stock in return for certain business debts being forgiven. 128 F.2d 418, 418 (5th Cir. 1942). The company realized gains on two of the blocks of stock, losses on the other two, and an overall gain when all of the gains and losses on the four blocks were netted. *Id.* at 419. This four-block sale raised the specter of a statute similar to § 356(c) that would require recognition of the two gains and prohibit recognition of the two losses. The company attempted to avoid the non-recognition problem by characterizing the four-block transfer as one big exchange, thereby allowing the company to subtract the two-block loss from the larger two-block gain and report to the IRS one smaller gain. *Id.* The Commissioner, the Tax Court's predecessor, and the Fifth Circuit all found this arrangement impermissible, holding that when a transaction involves "separate unit[s]" each unit must be analyzed separately. *Id.*

Here, Tseytin tries to do what *Lakeside* prohibits. He asks the Court to treat the two blocks of USSI stock—his block and Archer's—as one unit, sold in one exchange. If

---

(2) the property received in the exchange or distribution consists not only of property permitted by section 354 or 355 to be received without the recognition of gain or loss, but also of other property or money,

then no loss from the exchange or distribution shall be recognized.

I.R.C. § 356(c).

we did so, Tseytin believes he could subtract a loss of more than $500,000 on the Archer shares from a gain of more than $17 million on his original shares. The Commissioner disputes whether Tseytin's math is correct,[3] but even assuming it is, at least two undisputed factors support the Tax Court's finding that Tseytin's USSI stock holdings were composed of two units: Tseytin acquired one block of USSI stock approximately three years before the second block, and he held a vastly different basis in the two blocks. Given that the blocks are indeed separate, § 356 prohibits recognition of any loss in the Archer block, as the Tax Court correctly held.

Tseytin argues we should depart from *Lakeside*'s rule at least in cases like this one, where a taxpayer seeks to recognize only a small loss alongside a much larger gain. That argument has been twice considered and rejected, or at least deferred, by the Department of the Treasury. The Department issued notices of proposed rulemaking in 2006 and 2009 stating that it was considering the issue and soliciting comments on the matter. 74 Fed. Reg. 3509, 3509-3511 (Jan. 21, 2009); 71 Fed. Reg. 4264, 4266 (Jan. 26, 2006). Neither of those notices were followed by the promulgation of a rule or any other agency action. Also, neither of the notices provide an argument or explanation (or even a recitation of someone else's argument or explanation) as to why what Tseytin proposes could be advantageous. From our perspective, *Lakeside*'s approach is better: separate

---

[3] Indeed, according to the Commissioner Tseytin's netting argument would hurt him rather than help. The I.R.S. found Tseytin liable for a $17.3 million gain, but under the Commissioner's math netting the Archer shares with Tseytin's original shares would result in a much higher gain of more than $23.1 million, not the $16.8 million that Tseytin claims. We need not decide whose calculation is correct, however, because a netting approach is not available here.

units must be treated separately to prevent § 356's exception from swallowing § 354(a)'s rule. Perhaps a later case or agency rule will further explore what it means for an exchange to be composed of "separate" units. But given the current landscape, the Tax Court did not err with regard to the loss-recognition issue.

## IV.

One final matter remains: Michael Tseytin's wife, Ella Tseytin, is also an appellant and a party to this appeal. Both the Commissioner and the Appellants agree that she was inadvertently and erroneously held liable in the Tax Court for her husband's tax deficiencies. We will remand the case to the Tax Court to provide it an opportunity to address the issue.

## V.

The Tax Court's decision was correct, and we will therefore affirm with a limited remand on the issue of Appellant Ella Tseytin's liability.