JANE MELTON HOUSEHOLDER, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Householder v. Commissioner
Docket Nos. 35749-85; 35800-85; 35801-85
United States Tax Court
T.C. Memo 1989-561; 1989 Tax Ct. Memo LEXIS 559; 58 T.C.M. (CCH) 382; T.C.M. (RIA) 89561; October 11, 1989
*559 In year one, P1 formed P2, a C corporation, and was its sole shareholder. In year one, P2 built an apartment complex and rented the complex for four years. In year five, P2 sold the apartment complex, and P1 reported the gain from the sale, under the installment method, in years five and six on his return. Held: P2 did not execute a deed conveying ownership in the apartment complex to P1 in year one, so P2 was the owner of the complex. Held further: P2 will not be disregarded as a taxable entity because it had a valid business purpose and conducted business activities. Held further: P2 was not acting as an agent for P1 with respect to the apartment complex. Held further: P2 did not have a net operating loss deduction from prior years. Held further: P2 had sufficient earnings and profits for the constructive distributions to P1 to be dividends. Held further: P2's sale of the apartment complex was not an informal complete liquidation because P2 did have an intent to liquidate. P1 was the sole shareholder of M, a subchapter S corporation. On January 3, 1980, M sold a service station to G. P1 received the net proceeds from the sale and reported the *560 gain from the sale on his return. M did not report the sale on its Form 1120S. In February and March, 1980, M distributed seven service stations to P1. On February 23, 1980, P1 sold his M stock to J. Held: M was the party who sold the service station to G, not P1. Held further: The seven service stations distributed to P1 were intended to repay a shareholder loan, and the net proceeds from the sale of the first service station were a constructive distribution on P1's stock. Held further: The value of the seven service stations distributed was $ 168,250 on the date of distribution. P3's residence was burglarized twice in 1980. P3 estimated that the total amount of property stolen in both burglaries was $ 6,390. P3 did not own $ 430 of the property stolen. P3's insurance company paid $ 1,482.32 on the claim that P3 filed. Held: P3 has substantiated $ 1,000 of her theft loss based on a reasonable estimate of the stolen property's fair market value. Peter J. Towle, for petitioner Jane Melton Householder. Dale C. Allen, for petitioners K. T. Industries, Inc., and Charles E. and Alma Lee Scott. Howard P. Levine, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Chief Judge: Respondent determined deficiencies in and additions to petitioners' Federal income taxes *561 as follows: Docket
Petitioner
No.
Year
Deficiency
Jane Melton
35749-85
1980
$ 22,949.00
Householder
K.T.
35800-85
1979
23,170.00
Industries,
1980
2,941.00
Inc.
Charles E.
35801-85
1980
26,910.25
& Alma Lee Scott
1981
349.00
Docket
Additions to Tax
Petitioner
No.
Sec. 6653(a)
Sec. 6653(a)(1) Sec. 6653(a)(2)
Jane Melton
35749-85
--
--
--
Householder
K.T.
35800-85
1,158.50
--
--
Industries,
147.05
--
--
Inc.
Charles E.
35801-85
1,345.51
--
--
& Alma Lee Scott
--
$ 17.45
50% of interest
due on $ 349
(Unless otherwise indicated, all section references are to sections of the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.) After concessions, the issues for decision are whether: (1) petitioner K.T. Industries, Inc., is the owner of the Scottish Arms apartment complex; (2) petitioners Charles E. and Alma Lee Scott (the Scotts) are liable for income tax on the sale and distribution of property by Midtown Oil, Inc.; (3) petitioner Jane Melton Householder (Householder) substantiated *562 theft losses claimed on her 1980 joint income tax return; and (4) petitioners K.T. Industries, Inc. and the Scotts are liable for additions to tax under section 6653(a)(1) and 6653(a)(2). At the time of filing her petition, petitioner Jane Melton Householder resided in Knoxville, Tennessee. During 1980, Householder was married to Arthur J. Melton (Melton) and with him filed a joint return for 1980. Householder was subsequently granted an absolute divorce from Melton. At the time of filing its petition, petitioner K.T. Industries, Inc. (K.T. Inc.), was a Tennessee corporation and had its principal place of business in Kingston, Tennessee. At the time of filing their petition, petitioners Charles E. Scott (Scott) and Alma Lee Scott were husband and wife and resided in Kingston, Tennessee. For 1980 and 1981, they timely filed joint income tax returns. Petitioner Alma Lee Scott is a party to this proceeding solely because she filed jointly with her husband. Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. For convenience, we combine the Findings of Fact and Opinion by *563 issue. Scottish Arms Apartments
Petitioner Scott organized and actively participated in several successful businesses. Scott organized and served as president of Scottish Inns of America, Inc., a motel chain. Scott was the sole shareholder of Midtown Oil, Inc., and majority shareholder of Scot-Bilt Industries Inc., a publicly-traded company, and Consolidated Mortgage Company, Inc.
In January, 1975, Scott began to develop the first of what he hoped would be many prefabricated apartment complexes. On January 30, 1975, Scott incorporated K.T. Inc. The corporate charter declared that the corporate purpose among others was "to manufacture, construct, rent, sell, lease and otherwise deal in residential, commercial and industrial buildings and facilities." On February 18, 1975, Scott accepted "on behalf of K.T. Corp." a loan commitment from Tennesco, Inc. (Tennesco). Tennesco agreed to lend $ 400,000 for 15 years at an interest rate of 10 percent to "a corporation to be formed, the principal stockholder to be Charles E. Scott." On March 11, 1975, K.T. Inc. acquired land from R. L. Robertson for $ 10,000. K.T. Inc. did not take title to the land as an agent. On March 11, 1975, Scott *564 as president and Vance Bailey as secretary of K.T. Inc. executed a trust deed in favor of Hamilton Bank to secure a temporary construction loan from Hamilton Bank for $ 400,000. On September 11, 1975, a notice of completion was prepared and executed for the Scottish Arms apartments, also called the Kingston apartments (the apartments). On September 12, 1975, the notice was recorded by the Register of Roane County, Tennessee. In September, 1975, the Hamilton Bank construction loan was replaced by the permanent Tennesco loan. Scott, as president of K.T. Inc., executed a promissory note with Tennesco for the $ 400,000 loan. Scott and Vance Bailey, as president and secretary of K.T. Inc., respectively, executed a deed of trust on the apartments in favor of Tennesco to secure the note. Early in 1975, Scott's certified public accountant advised him to have K.T. Inc. transfer title in the land to Scott, as an individual, so that the "front-end" losses could be taken on his individual return. In March, 1975, K.T. Inc. was issued the employer identification number 62-0940027. On January 5, 1976, Scott applied for a separate employer identification number in the name of K.T. Industries *565 to facilitate reporting the rental activities as a proprietorship. On February 4, 1976, K.T. Industries was issued employer identification number 62-0964786. On July 7, 1975, Scott, Vance Bailey and Virginia Pierce (Scott's daughter) opened checking account No. XX4-165 with the Hamilton Bank in the name of "K.T. Industries - Rental Account" (the account). Rents and expenses for the apartments were handled through the account. From 1975 to 1979, the Scotts reported the apartment's rental activities under the name of " K.T. Industries" on Schedule C of their joint income tax returns. For the years 1975 through 1978, K.T. Inc. did not file corporate income tax returns. For 1979, K.T. Inc. filed a corporate return which declared that it had no assets and represented as follows: "NOTE: NO ACTIVITY -- CORPORATION NOT ACTIVATED." Sometime in 1979 or 1980, Scott decided to sell the apartments. Scott retained John Bourbour, a real estate agent, to sell the apartments. Scott told prospective buyers that the apartments were owned in the name of K.T. Inc. Scott also stated that he was using the apartments as a tax shelter by treating them as if they were owned individually. The deed *566 of trust securing the Tennesco loan permitted Tennesco to demand full payment of the loan "on transfer of all or any part of the [apartment] Property, or any interest therein." Scott believed that Tennesco would exercise its option to accelerate the loan, or demand an assumption fee, were the property transferred outright. To avoid triggering the due on sale clause, on July 30, 1980, Scott, as president of K.T. Inc., and Edward D. and Melanie P. Aycoth (the Aycoths) agreed in the "Contract for Sale" that, in the event the first mortgage could not be assumed, Scott would give the Aycoths a wrap-around mortgage. On August 29, 1980, the "Contract for the Delivery of a Deed and Acquisition of Real Estate" was drafted by Edward Michael Ellis and executed by Scott, as president of K.T. Inc. The Aycoths paid a $ 110,000 cash downpayment and delivered a 10-year $ 120,000 interest-bearing promissory note (Aycoth note) payable beginning on October 1, 1980, and agreed to make payments on the Tennesco loan. The Aycoths also executed a deed of trust on the apartments in favor of K.T. Inc. to secure the Aycoth note. During 1983, the Aycoths defaulted on their note and filed for bankruptcy. *567 On February 1, 1984, K.T. Inc. recovered the apartments from the bankruptcy estate. At the time of recovery, the apartments were in poor physical condition. K.T. Inc. spent $ 45,000 on improvements and rented the apartments. In 1980, the Scotts reported $ 111,197.25 of gain from the sale of the apartments, under the installment method, on their joint return. They also reported $ 2,985.32 of interest income from the installment payments received on their joint income tax return. In 1981, the Scotts reported $ 5,790.95 of installment sale income and $ 11,483.54 of interest income from installment payments received on their joint income tax return. In 1980 and 1981, K.T. Inc. declared on its corporate return that it had no assets or income and represented "NOTE: NO ACTIVITY -- CORPORATION NOT ACTIVATED." In the statutory notice of deficiency for 1980 and 1981, respondent determined that (1) K.T. Inc. was the owner of the apartments so gain from the sale of the apartments and interest payments made on the Aycoth note were taxable to K.T. Inc.; and (2) Scott's receipt of the sales proceeds and interest was a constructive dividend distribution from K.T. Inc. *568 Petitioners have the burden of proving that respondent's determinations were in error. Rule 142(a). Petitioners assert that K.T. Inc. executed a deed conveying the apartments to Scott during 1975 so Scott owned the apartments. Gain or loss from the sale or use of property is attributable to the owner of the property. Commissioner v. Bellinger, 485 U.S. 340, 108 S. Ct. 1173 (1988). Petitioners rely exclusively on the testimony of Scott and Edward Michael Ellis (Ellis), his attorney and nephew who allegedly drafted the deed, to establish that a deed was executed. Allegedly on the advice of Scott's accountant, Scott and Ellis testified that, during 1975, a deed was executed transferring ownership to Scott, as an individual. Petitioners contend that the "uncontroverted" testimony of these witnesses establishes that a deed was executed. We do not agree. Scott failed to produce either the executed deed or a copy thereof from Ellis' files. The alleged deed was not recorded. After the alleged deed was executed, Scott consistently *569 represented to third parties such as the Aycoths and the bankruptcy court that K.T. Inc. owned the apartments. The Contract for Delivery of the Deed specifies the selling party and the owner of the apartments to be " K.T. Industries Inc." The latter document was drafted by Ellis approximately four years after he allegedly drafted the deed conveying the apartments to Scott. Scott and Ellis' representations and the lack of documentary proof make their testimony self-serving and unpersuasive. Because petitioners have failed to prove that the apartments were conveyed to Scott, we hold that K.T. Inc. was the owner of the apartments. Petitioners next assert that K.T. Inc. should be disregarded for tax purposes because it did not have a valid business purpose or engage in any business activity. We do not agree. In Moline Properties v. Commissioner, 319 U.S. 436, 438-439 (1943), the Supreme Court stated: The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed *570 convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity [fn. refs. omitted]. * * * The doctrine enunciated in Moline Properties has been interpreted to mean that when a corporation has a valid business purpose or actually engages in business activities, it will be recognized as a separate taxable entity. Strong v. Commissioner, 66 T.C. 12 (1976), affd. 553 F.2d 94 (2d Cir. 1977); Elot H. Raffety Farms, Inc. v. United States, 511 F.2d 1234 (8th Cir. 1975); Jackson v. Commissioner, 233 F.2d 289 (2d Cir. 1956), affg. 24 T.C. 1 (1955). Scott organized K.T. Inc. to develop prefabricated apartment complexes. K.T. Inc's charter states that the corporation was organized for numerous business purposes, including the construction, rental and sale of residential real estate. K.T. Inc. acquired land, secured a construction loan, executed a notice of completion and secured *571 a permanent loan for the apartments. K.T. Inc. sold the apartments and recovered the apartments when the buyer went into default. Because K.T. Inc. was the owner of the apartments, the rental activities were also attributable to K.T. Inc. These activities were well beyond the minimal activities required for recognition of K.T. Inc. as a separate taxable entity. Britt v. United States, 431 F.2d 227 (5th Cir. 1970). We find that K.T. Inc. had a valid business purpose and engaged in business activities consistent with that purpose. Thus, we hold that K.T. Inc. was a separate taxable entity. Petitioners next assert that K.T. Inc. was Scott's agent. However, petitioners do not claim to have satisfied any of the established criteria for an agency relationship. See Commissioner v. Bollinger,supra. Instead, petitioners assert that Scott is taxed on the gain from the sale of the apartments owned by K.T. Inc. because Scott had actual "command and control" over the apartments. See Griffiths v. Commissioner, 308 U.S. 355 (1939). In National Carbide Corp. v. Commissioner, 336 U.S. 422, 429 (1949), the Court stated *572 "Complete ownership of the corporation, and the control primarily dependent upon such ownership * * * are no longer of significance in determining taxability." K.T. Inc. will not be disregarded merely because the sole shareholder, Scott, retains direction of K.T. Inc.'s affairs down to the minutest detail, provides all its assets and takes all of its profits. National Carbide Corp. v. Commissioner, supra at 433-434; Weigman v. Commissioner, 47 T.C. 596, 605 (1967), affd. per curiam 400 F.2d 584 (9th Cir. 1968). Petitioners have failed to prove that an agency relationship existed between Scott and K.T. Inc. Thus, we find that K.T. Inc. was not Scott's agent. We further note that at trial petitioners stated that they were not asserting agency. Petitioners next contend that K.T. Inc. had no taxable income because the net operating losses claimed by the Scotts from 1975 to 1979 on their joint income tax returns are properly attributable to K.T. Inc. Petitioners further contend that K.T. Inc. had an earnings and profits deficit attributable to the net operating losses from 1975 to *573 1979, so the amount of Scott's constructive dividend is reduced. Petitioners have the burden of proving both the right to and amount of the net operating loss deduction and the earnings and profits deficit. Helvering v. Taylor, 293 U.S. 507 (1935); see Truesdell v. Commissioner, 89 T.C. 1280, 1295-1296 (1987). Petitioners have not submitted any evidence from which the Court can determine the amount of and right to deductions for prior years. The Scotts' tax returns do not substantiate the deductions claimed therein. See Halle v. Commissioner, 7 T.C. 245 (1946), affd. 175 F.2d 500 (2d Cir. 1949). Petitioners have failed to meet their burden of proof. Therefore, we find that K.T. Inc. did not have a net operating loss deduction or an earnings and profits deficit. Petitioners next assert that the sale of the apartments and the distribution of the proceeds to Scott were part of an informal liquidation of K.T. Inc. Whether a *574 corporation is in a state of liquidation is a question of fact. T.T. Word Supply Co. v. Commissioner, 41 B.T.A. 965, 981 (1940). We apply the following three-prong test in making such a factual determination: (1) Is there a manifest intention to liquidate; (2) is there a continuing purpose to terminate and dissolve; and (3) whether the corporation's activities are directed and confined to that purpose. Estate of Maguire v. Commissioner, 50 T.C. 130, 142 (1968). The facts show that K.T. Inc. did not intend to liquidate. K.T. Inc. did not adopt a formal plan of liquidation or distribute the Aycoths' note to Scott or label either its 1981 or 1982 tax returns as a "final return." Three years after the alleged liquidation, K.T. Inc., recovered the apartments from the Aycoths' bankruptcy estate, made substantial physical improvements to the apartments, and continued to rent the apartments. These activities show that K.T. Inc. lacked an intention to liquidate. We find that K.T. Inc. was not in a state of liquidation when the apartments were sold and the proceeds were distributed to Scott. Midtown Oil Company, Inc.
Petitioner Scott was the sole *575 shareholder of Midtown Oil Company, Inc. (Midtown), a subchapter S corporation. Midtown was a distributor of oil and gasoline for Phillips Petroleum. Midtown owned among other properties a warehouse, service stations, gas station pumps, underground tanks and delivery trucks. On January 3, 1980, Scott as president of Midtown executed a deed conveying a service station located in Oak Ridge, Tennessee (Oak Ridge station) to Rex R. and Wilma R. Gass (the Gasses). Pursuant to the closing agreement, the Oak Ridge station was sold to the Gasses for $ 162,000 less related selling expenses of $ 29,599.75 for net proceeds of $ 132,400.25. The Gasses purchased the Oak Ridge station with a check made payable to the order of "C. E. Scott, Midtown Oil, Inc." for $ 132,400.25, dated January 3, 1980. Hereinafter, the net proceeds from the sale of the Oak Ridge station will be referred to as "the cash." During late 1979 and early 1980, Scott negotiated an agreement with A. J. Melton (Melton) for the sale of Midtown. Initially, Scott wanted Melton to purchase all of his Midtown stock and assume all of Midtown's liabilities including a shareholder loan (the loan) with Scott for $ 92,454.50. *576 However, Melton could not afford to both purchase the stock and assume the loan. Scott and Melton agreed that Midtown would retire the loan by distributing several service stations to Scott so Melton could purchase Midtown. On February 22, 1980, Scott, as president of Midtown, executed a deed conveying six service stations to himself, as an individual, for the stated consideration of $ 62,000. On February 23, 1980, Scott sold his Midtown stock to Melton for $ 300,000 ($ 30,000 cash and $ 270,000 note). The corporate stock sale agreement states: Mr. Melton understands that the corporation has conveyed its service station properties to Mr. Scott in satisfaction of a corporate debt owed to Mr. Scott. On March 4, 1980, Melton, as president of Midtown, executed a second deed conveying a service station to Scott for the stated consideration of $ 15,000. An independent appraisal estimated the value of the seven service stations to be $ 168,250, 18 months after the distribution. Hereinafter, the seven service stations distributed to Scott will be referred to as "the property." For 1980, the Scotts reported the sale of the Oak Ridge station as a short-term capital gain of *577 $ 118,306.85 (sales proceeds of $ 162,000 less basis of $ 43,693.15) on their joint income tax return. The Scotts reported a $ 30,000 long-term capital gain on the sale of their Midtown stock, under the installment basis, on their 1980 joint income tax return. The Scotts did not report the property distribution on their return because they considered the distribution to be a tax-free repayment of the loan with property of equal value. For 1980, Midtown did not report the sale of the Oak Ridge station on its corporate return. In the statutory notice of deficiency, respondent determined that Midtown: (1) sold the Oak Ridge station; (2) distributed the cash to Scott to repay the $ 92,454 shareholder loan and pay a $ 39,855 cash dividend; and (3) distributed the property to Scott as a dividend of $ 154,320 (the property value of $ 168,250 less liabilities assumed of $ 13,930). Petitioners have the burden of proving that respondent's determination was in error. Rule 142(a). Petitioners first assert that Scott sold the Oak Ridge station to the Gasses, not Midtown. We disagree. All documents show that Midtown sold the Oak Ridge station. The deed and the closing agreement state *578 that Midtown was the transferor and the seller of the Oak Ridge station. Scott executed each document as president of Midtown. The Gasses' check was payable to "C. E. Scott, Midtown Oil, Inc." Because Scott was acting as president of Midtown, Midtown sold the Oak Ridge station. Petitioners next assert that Midtown intended to repay the loan by distributing to Scott the property, not the cash. We agree. Whether Midtown intended to distribute the cash to repay the loan or to pay a dividend is a question of fact. Lengsfield v. Commissioner, 241 F.2d 508 (5th Cir. 1957), affg. a Memorandum Opinion of this Court. The record shows that Midtown intended to repay the loan by distributing the property. Scott and Melton agreed that Midtown would distribute the property to repay the loan. The contract for sale expressly states that intent. Pursuant to the contract, the last service station was distributed after Melton purchased Midtown. The cash was distributed six weeks prior to the sale of Midtown. Scott and Melton clearly considered the loan outstanding after the cash distribution and distributed the property to retire the loan. Because Midtown intended to *579 repay the loan with the property, the cash was a distribution on stock. Petitioners next contend that the property distributed to Scott had a value equal to the loan. Petitioners attempt to establish the property's value by reference to negotiations with Melton. Scott testified that he and Melton initially negotiated a $ 400,000 purchase price for Midtown after long and arduous negotiations. Scott further testified that Midtown distributed the property to reduce the purchase price to $ 300,000. Melton did not testify, and no other documents were submitted showing that the initial purchase price for Midtown was $ 400,000. Petitioners, however, contend that Scott's uncontradicted testimony shows that the property was worth approximately $ 92,454. Respondent's determination is supported by an appraisal. An independent appraisal estimated that the property was worth $ 168,250 18 months after distribution. The appraisal contained a detailed report of each service station with an estimate of value. Petitioners have the burden of proving that respondent's determination was erroneous. Rule 142(a). Petitioners do not challenge the accuracy of the appraisal. Instead, petitioners *580 argue that the appraisal value 18 months after distribution is not probative of the value of the property at the time of distribution. We consider the property's value shortly after distribution probative of the property's value at distribution. See Estate of Loewenstein v. Commissioner, 17 T.C. 60 (1951). Petitioners did not present any evidence of market conditions which would explain almost a two-fold increase in value in only 18 months. In light of the appraisal value, we find Scott's uncorroborated testimony unpersuasive. Petitioners have failed to prove respondent's determination was erroneous. Thus, we find that the property was worth $ 168,250 on the date of distribution. In the statutory notice of deficiency, respondent also determined that: (1) Scott recognized $ 18,526 of ordinary income on retirement of the loan; and (2) Midtown recognized gain of $ 138,598 (sales proceeds of $ 162,000 less $ 23,402 of basis) from the sale of the Oak Ridge station and additional depreciation and property tax deductions of $ 1,071 and $ 13,541, respectively. Petitioners *581 do not challenge these determinations. We treat the determinations as conceded. Theft Losses
Petitioner Householder's residence was burglarized twice in 1980. Householder estimated that the total cost of the property stolen in both burglaries was $ 6,390. She testified that fair market value of the property stolen was equal to or greater than the estimated cost. Householder's daughter owned $ 430 of the property stolen. Householder recovered $ 1,482.32 of her estimated loss from her insurance company. On her 1980 income tax return, Householder claimed a deduction of $ 5,977 for the theft loss. In the statutory notice of deficiency, respondent disallowed the theft loss deduction because petitioners failed to establish that a loss was sustained during the taxable year. Petitioners contend that the evidence submitted is sufficient to substantiate the theft loss. A deduction is permitted for a theft loss not compensated by insurance or otherwise. Sections 165(a) and 165(c)(3). The theft loss deduction is limited to the lesser of the cost basis or the fair market value, at *582 the time of the theft, of the property stolen. Sections 1.165-7 and 1.165-8, Income Tax Regs. To sustain their burden of proof, petitioners must establish both the cost basis and the fair market value of the property stolen. Welch v. Helvering, 290 U.S. 111, 115 (1933). The cost basis or the fair market value of property acquired many years ago for personal use may be difficult to establish. Thus, a reasonable estimate of the stolen property's cost basis and fair market value is permitted. See Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). Householder estimated that the property stolen cost $ 6,390. Householder did not own $ 430 of the property stolen. Householder recovered $ 1,482 of her estimated loss from her insurance company. Thus, Householder had an estimated loss, not compensated by insurance, of $ 4,478. Householder estimated that the cost basis of the property stolen was $ 4,478 and testified that the property stolen had a fair market value at least equal to its cost basis. Under Cohan, we estimate that the $ 4,478 of property stolen had a fair market value of $ 1,000 and find that Householder has substantiated a $ 1,000 *583 theft loss, not compensated by insurance. We further note that section 6004 of the Technical and Miscellanous Revenue Act of 1988 amends section 424(c) of the Tax Reform Act of 1984 by amending the innocent spouse provision. Pursuant to an Order of this Court, respondent filed a status report in which he conceded that Householder qualifies as an innocent spouse under the retroactive amendments. Thus, Householder is not liable for any tax due from adjustments to Midtown's income or deductions. The statutory notices of deficiency determined that petitioners K.T. Inc. and the Scotts were liable for additions under section 6653(a) for the taxable years in issue. Petitioners do not contest these determinations. Thus, we treat the issue as conceded. To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners have been consolidated herewith: K.T. Industries, Inc., docket No. 35800-85; Charles E. Scott and Alma Lee Scott, docket No. 35801-85.↩