CHARLA GATES CANNON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cannon v. Commissioner
Docket Nos. 9671-82; 2261-85
United States Tax Court
T.C. Memo 1990-148; 1990 Tax Ct. Memo LEXIS 172; 59 T.C.M. (CCH) 164; T.C.M. (RIA) 90148; March 20, 1990, Decided Towner Leeper, for the petitioner. Ana Guerrero Cummings and John F. Eiman, for the respondent. DRENNEN
*311 MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: [1] In two separate notices of deficiency, respondent determined deficiencies in petitioner's income tax for the taxable years and in the amounts shown below: Year
Amount
1976
$ 156,531
1977
245,576
1978
123,155
1979
106,628
Petitioner filed two petitions, one for the years 1976 and 1977 (docket No. 2671-84) and one for the years 1978 and 1979 (docket No. 2261-85). The issues in both dockets were similar so the cases were consolidated for trial, briefs, and opinion. The parties filed stipulations of *175 facts and the facts stipulated therein are so found. After concessions by petitioner, the remaining basic issue is whether petitioner is entitled to deduct amounts of money she allegedly paid, through Vemco, a limited partnership in which she was a limited partner, in connection with a gold and silver mining venture in Durango, Mexico, during each of the years at issue. More specifically, the issues are: (1) Whether the mining venture was an activity not engaged in for profit by and through Vemco within the meaning of section 183(a); [2]
(2) Whether the funds advanced to two Mexican corporations, by and through Vemco, were nondeductible shareholder contributions to the Mexican corporations or were deductible expenses of a joint venture between Vemco and the Mexican corporations; (3) Whether amounts paid by Vemco to persons other than the Mexican corporations in connection with the exploration, development, and operations of the mining concessions constituted nondeductible capital contributions to the Mexican corporations; (4) Whether the expenditures, if not capital contributions, were paid in connection with mining development (section 616) or mining exploration (section *176 617); (5) Whether all of the aforementioned expenditures were ordinary and necessary; (6) Whether petitioner has substantiated all of the amounts and the nature of the aforementioned expenditures; and (7) Whether the application of section 482 reduces Vemco's (and petitioner's distributive share of) claimed inventory loss to zero for the taxable year 1976. FINDINGS OF FACT Petitioner, Charla Cannon, was a widow who lived in Denver, Colorado. She had a large annual income, primarily from various trusts established by her family, and from her deceased husband's estate, and various other benefits provided under bonus and pension plans by her deceased husband's former employer, Beatrice Foods Co. She had no education or experience in mining or engineering, except what she might have gleaned from her father, who was a mining engineer. She was 67 years of age at the time of trial in 1986. She received a junior college education at Bennington College in New York. She was engaged *177 in several businesses prior to becoming involved in Vemco, including Cannon Aeronautical Center, *312 raising sheep in Wyoming, a health spa for women, and selling helicopters in Colorado. In 1973 petitioner became involved with a limited partnership, Vemco, in which she was a 54 percent limited partner. Vemco was a Texas limited partnership formed by Ramon Perez Madrid. The limited partnership was reconstructed under the same name in 1975. The limited partnership then consisted of Hersey W. Young, Jr. and Harold B. Young, general partners, and Charla G. Cannon, H. R. Chrisman, M.D., and Carl W. Weaver, limited partners. The limited partnership agreement executed in 1975 set forth the purpose for Vemco which was "to engage in the business of land development, exploration, mining and ore processing both in the United States and foreign countries." This limited partnership agreement was amended again as of January 1, 1978. It recited that subsequent to the establishment of the partnership it needed additional funds to conduct its business operations, and Cannon had provided those funds; also that Cannon was willing to "provide further contributions to the partnership as requested by *178 the general partner" provided the agreement was executed. It stated further that because of the agreement of Cannon to contribute additional capital to the partnership while the other partners were not contributing significant additional capital or services, it was agreed that the allocation of profits of the partnership, as well as the proceeds in the event of sale or disposition of the partnership assets, should be allocated as follows: Name
Percentage
Charla G. Cannon 45%
Hersey W. Young, Jr. 30%
H. R. Chrisman, M.D. 9%
Carl W. Weaver 8%
Harold B. Young 8%
It was also agreed that the annual expenses and losses of the partnership would continue to be allocated to Cannon insofar as her capital account permitted. All of the expenses of the mining ventures, which were paid by petitioner through Vemco, were allocated to petitioner during the years here involved. Hersey W. Young, Jr. was designated to be the sole general partner with Harold Young, Cannon, Weaver, and Chrisman being limited partners. Harold B. Young resigned as a general partner. In about 1970 Madrid acquired all the mining concessions for three mining claims, Ampl. de San Jose, *179 San Jose, and Tres de Mayo, which were located in Sierra Madre Occidental Mountain range in the State of Durango, near the village of Manzanillas, in the Republic of Mexico. Madrid started working these claims prior to 1973. The three San Jose mines were located in very mountainous country, near Durango, Mexico, at an elevation of 6,000 to 6,500 feet above sea level. The terrain is rough and the hillsides are very steep and roads are on a contour. Manzanillas is the nearest village. A very primitive road connecting Manzanillas and Topia, extending about 35 kilometers in length, was in place in 1973. The mines had been opened and worked by hand through shafts and tunnels. Gold and silver were found in veins extending underground. Carl Weaver, an experienced miner and a limited partner in Vemco, entered into an agreement with Madrid in 1973 whereby Weaver paid Madrid $ 300 per month for the right to conduct exploration activities for a limited time at the site of the Madrid mining concessions. In return, Madrid obligated himself to transfer the mining concessions to a Mexican mining corporation at Weaver's request. After spending approximately 30 days at the mining site, *180 Weaver prepared and submitted a report on the San Jose mining properties to Hersey Young, Vemco's general partner and a long time business associate of petitioner. In his report, Weaver estimated that the mine had been in operation since 1913 and that the ore in the mine (gold and other metals) was obvious, being exposed in the face of the mine. Weaver estimated that with proper development the mines had a potential production of 50 tons per day, although the small, very primitive mill on the property could not mill more than three tons in 24 hours. Weaver recommended the on-site installation of a larger capacity mill because the cost of freight to transport ore to the nearest smelter was about $ 100 per ton. Weaver also reported that the per ton ore values of various ore samples taken from the Taonita vein (located approximately one-half mile south of the San Jose mine) averaged between 0.7 and 1.0 ounces of gold and 9.0 ounces of silver. Vemco's decision to invest in the mining concessions was based on Weaver's findings and on the findings of an engineer, Henry P. Ehrlinger (deceased at the time of the trial), whom Young retained to analyze and report on the mining properties. *181 Ehrlinger was a professor of mining and engineering at the University of Texas at El Paso with much experience in mining activities in Mexico. Ehrlinger visited the mine and subsequently sent Ralph Wilcox, Jr., then a graduate geology student at the University of Texas at El Paso, to the location of the mining claims. Wilcox prepared a report, dated April 1975, which included the assay results of the ore samples taken from the areas in which Manzanillas Corporation held mining concessions. In his discussion of Taonita, Wilcox revealed the following assay results of certain ore samples: *313 Ounces of
Ounces of
Description
Gold Per Ton
Silver Per Ton
Channel sample
0.04
0.76
Channel sample
0.28
6.04
Quartz vein
0.04
0.60
The report also included a discussion of the Tres de Mayo mine and contained the following assay results of three channel samples taken at or near the mine: Ounces of
Ounces of
Description
Gold Per Ton
Silver Per Ton
N 1 Entrance, first level
0.34
3.16
N 2 Second level, rear
0.04
0.58
N 3 Third level, rear
0.96
13.18
Wilcox's report also included the following comments regarding the mill located *182 below Manzanillas: "At current crushing capability, the mill can process about one ton per day with about 60% recovery of precious metals. The crusher is old and failing." Ehrlinger prepared a mining report, dated May 1975, which included Wilcox's findings. Ehrlinger's report contained profit projections based on 50 tons of ore mined daily and a respective gold and silver ore grade of 0.70 and 9.0 troy ounces per ton of ore mined. Total monthly expenses were projected at $ 99,011.68. Of these monthly expenses only one, income taxes of $ 18,117.68, varied with changes in profitability. All other expenses, fixed or variable, were unaffected by changes in the precious metal ore grade per ton of ore mined. Ehrlinger's report projected a monthly ore mining operating rate of 1,200 tons and a "net calculated monthly profit" of $ 50,172.32 if properly exploited. Ehrlinger's report also contained a copy of the El Paso Chemical Laboratories report addressed to Ehrlinger. The El Paso Chemical Laboratories report contained the assay results of 12 ore samples, partially reproduced below: RESULTS
Gold
Silver
Sample
Designation
oz/ton
oz/ton
N-1
RW-T-14
0.04
0.60
N-1
RW-N-1
0.34
3.16
N-1
RW-M-19
0.01
0.33
N-1
RW-T-10
0.03
0.49
N-1
RW-T-15
0.04
0.60
N-1
RW-T-21
0.28
6.04
N-1
RW-F-1
0.03
0.63
N-1
RW-M-24
0.01
0.33
N-1
RW-N-3
0.96
13.18
N-1
RW-N-2
0.04
0.58
N-1
RW-T-8
0.04
0.46
N-1
RW-T-13
0.04
0.76
*183 Ehrlinger's report further included various mineral descriptions, prepared by Wilcox, of the 12 ore samples, including the location from which they were extracted, most of which were from either Tres de Mayo or Taonita. Petitioner read both Weaver's and Ehrlinger's reports. Petitioner had known Weaver for some time and had confidence in his metallurgical knowledge. She read his report on the San Jose mining properties and agreed to make an investment therein. After petitioner read Ehrlinger's report, which predicted a net profit of $ 50,172.32 per month if the mines were properly developed with an adequate mill, she was willing to invest more in the project. Vemco also became interested in the mining concessions as a potential investment. Vemco entered into an agreement with Madrid that Madrid would put his mining interests into a corporation or partnership and that Vemco would put up the money to cover the costs of defining and developing the mines, which would be repaid first out of the profits from the mine with the balance of the profits being divided equally between them. After petitioner learned from her Mexican legal counsel that Mexican law prohibits non-Mexican *184 nationals or corporations from acquiring a majority interest in Mexican mining concessions, the interested individuals decided that a corporate ownership was the legal mechanism which would best facilitate indirect ownership of the mining concessions. Madrid later transferred his mining concessions to a Mexican corporation, known as Compania Minera San Jose de Manzanillas, S.A. (Manzanillas). Subsequent to the transfer Vemco became a 49 percent shareholder in Manzanillas. The remaining 51 percent was issued to Mexican nationals. However, because of further Mexican law requirements, the stock representing Vemco's 49 percent was issued in the name of petitioner, and Hersey W. Young, Jr., for the benefit and on behalf of Vemco. Madrid was president of Manzanillas until 1978. Madrid supervised the mining and milling activities of Manzanillas at the site of the mining claims. He testified that during the time he worked the claims all the extraction was done by hand. Madrid sold in his own name and in the *314 name of Manzanillas gold and silver extracted from the claims. During 1974-1978, Madrid deposited at least $ 47,288 of total sale proceeds either into his personal or Manzanillas' *185 bank accounts. After this embezzlement was discovered, Young "fired" Madrid in 1978. Subsequently, Young successfully brought suit against Madrid to recover these amounts. In 1976 and 1977, Vemco, acting through Young, contracted with third parties for the construction of roads and tunnels on the sites of the mining concessions and paid for the work with its own funds. It also contracted with Juan Sanchez to explore, repair and prepare the mining property of the Manzanillas' company. These contract expenditures were claimed by Vemco as exploration-development expenses, and totalled $ 165,827 in 1976, $ 335,584 in 1977, $ 180,000 in 1978, and $ 125,460 in 1979. In 1978 Memco S.A. de C.V. (Memco), was formed and the owner of Mexican mining concessions adjacent to the Madrid concessions, Raul Olguin Lopez (Lopez), subsequently transferred his mineral interests to Memco. Lopez was the president of Memco. Vemco was granted an option to acquire 49 percent of Memco's stock (Class B) in exchange for an agreement to explore the mining claim. The remaining 51 percent of Memco's stock (Class A stock) was subscribed for by Mexican nationals. On the same date Vemco contracted with Sanchez *186 for exploration of the mining claim at a cost not to exceed $ 180,000. Memco was to reimburse Vemco for the cost of exploring the mine with the profits earned from Memco's operations. Memco never operated at a profit. There was never any core drilling on any of the above mentioned mining claims. A rather basic procedure was used to extract and separate the gold from the mines. Activity at the mines was curtailed, to some extent, after it was discovered in 1978 that Madrid had been selling the ore for his own account. Romelia Carpenter has been involved in the actual preparation of Vemco's tax returns since 1978. Carpenter has also prepared various financial schedules of Vemco's accounting data relating back to 1973. At trial, Carpenter testified that, when available, she used source documents in preparing the financial schedules. But in certain situations, payments made under contract did not flow through Vemco's regular checking account. In those situations, Carpenter used the contract itself as a source document and relied upon oral verification that payment thereunder had been made. Vemco did not report any income from mining on any of its tax returns for the years *187 here involved. Neither Manzanillas nor Memco has ever paid a dividend to Vemco. The parties have stipulated that Vemco paid or incurred certain expenses in the years 1976, 1977, 1978, and 1979, which produced the losses claimed by Vemco in its tax returns for those years. Petitioner, by virtue of the limited partnership agreement, claimed these losses as Schedule E partnership losses. In his notices of deficiency, respondent determined the extent to which the amounts claimed by petitioner, through Vemco, should be disallowed. Those amounts disallowed by respondent totalled $ 187,173.96 for 1976, $ 354,608.29 for 1977, $ 214,078.00 for 1978, and $ 152,415.00 for 1979. The principal amounts disallowed by respondent were deductions claimed for each of those years for "exploration development" expenses which totalled $ 165,827.35 for 1976, $ 335,584.16 for 1977, $ 180,000.00 for 1978, and $ 125,460.00 for 1979. Vemco deducted these expenses on its tax returns for 1976 through 1979, labelling the 1976-1979 amounts as "development" expenses. Vemco also deducted additional expenses such as travel, vehicle, rent, etc. in the total amounts of $ 25,124.99 for 1976, $ 20,866.46 for 1977, *188 $ 36,308.00 for 1978, and $ 28,889.00 for 1979. Of those amounts, $ 21,346.61 for 1976, $ 19,024.40 for 1977, $ 2,230.00 for 1978, and $ 1,934.00 for 1979, were included as part of the total amounts disallowed by respondent. In his notices of deficiency, respondent set forth the following alternative grounds upon which he based his aforementioned determinations. Respondent does not agree that the amounts were expended for the purposes designated nor does respondent agree to the characterization of the amounts. Respondent also contends that the amounts claimed as deductions by Vemco represent amounts paid or incurred in connection with an activity not engaged in for profit. Alternatively, respondent argues that the amounts claimed as deductions by Vemco constituted nondeductible capital contributions to either Manzanillas or Memco inasmuch as the amounts were paid by Vemco, their shareholder, on the corporations' behalf for corporate expenses. Inventory Issue
Cannon Aeronautical, Inc. ("Aero"), of which petitioner was majority owner, was liquidated in 1975, and certain of its assets (copper wire and airplane parts) were distributed by Aero, as debtor, to petitioner, as *189 creditor, in partial satisfaction of a loan. Petitioner then transferred these assets to Vemco and received a credit to her capital account of $ 54,850, which was the book value of the assets on Aero's books at the time they were distributed to Vemco. The principal asset distributed was 275,000 feet of 20-strand copper wire recorded by Aero at a cost of $ 41,250. It had been purchased by Aero in 1970 and was obsolete at the time of the transfer to Vemco and had only scrap value. All of *315 the assets transferred were entered on Vemco's books at the cost reflected on Aero's books. In 1976 Vemco sold certain miscellaneous parts and supplies for $ 1,500. In 1976 it wrote down the value on the books of the remainder of these assets by a total of $ 42,250, $ 33,000 of which was attributable to the copper wire. On its returns for 1976 Vemco claimed cost of goods sold for these assets in the amount of $ 42,500, including the $ 1,500 worth that were sold. Of the $ 42,500 cost of goods sold claimed, $ 40,750 was attributable to the assets which were not sold in 1976. Respondent disallowed $ 40,750 of this claimed cost of goods sold expense. Respondent also determined that a $ 12,600 date *190 of acquisition fair market value should be allocated to the inventory assets. OPINION The parties have stipulated that Vemco paid or incurred certain expenses claimed as deductions on its tax returns for the years in question. The expenses claimed as deductions by Vemco generally fall into three broad categories: (1) amounts Vemco contributed directly to the two Mexican corporations, Manzanillas and Memco, who, in turn, allegedly paid out the contributions in connection with the exploration and development of their respective mining concessions; (2) amounts Vemco paid directly to third parties under contract in connection with the exploration and development of the Mexican mining concessions; and (3) amounts Vemco paid to others for the purchase of equipment and in the form of salaries, professional fees and overhead expenses as these amounts relate to the mining activities of the Mexican corporations. Petitioner contends that all of the amounts she paid out in connection with the mining activities are deductible under either section 162, 165, 212, 616, or 617. At trial, respondent reiterated the alternative bases, as set forth in his notices of deficiency, supra, upon *191 which he determined the extent to which petitioner's claimed deductions should be disallowed. First, the record does not support a finding that either petitioner or Vemco were directly engaged in the business of mining gold and silver in Mexico. So none of the expenses claimed by petitioners are deductible under section 162, which requires that they be paid or incurred in carrying on a trade or business. For the same reason none of those expenses are deductible by petitioner under section 165 as losses. If those expenses are deductible at all they must be deductible under section 212(1) as ordinary and necessary expenses paid or incurred for the production or collection of income, or under section 616 as mining development expenses or section 617 as mining exploration expenses. A basic requirement under all of the above provisions is a showing that the activity giving rise to the expenditure was engaged in by petitioner with the objective of making a profit. Horn v. Commissioner, 90 T.C. 908, 933 (1988); Patin v. Commissioner, 88 T.C. 1086, 1116 (1987). *192 Similarly, a deduction under section 617 depends upon a showing that the mining activities constituted a trade or business or were undertaken and carried on for the production of income, Patin v. Commissioner, supra at 1117, which, in turn, also depends upon a showing of a bona fide profit objective. Furthermore, section 183(a) provides the general rule that if an individual engages in an activity, and "if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." Section 183(b) provides for the following exceptions to section 183(a) nondeductibility: (1) Deductions which would be allowable without regard to whether such activity is engaged in for profit shall be allowed, section 1.183-1(b)(1), Income Tax Regs.; and (2) deductions which would be allowable only if such activity is engaged in for profit shall be allowed "but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1)." Section 183(b)(2). Section 183(c) defines an activity not engaged *193 in for profit as follows: (c) ACTIVITY NOT ENGAGED IN FOR PROFIT DEFINED. -- For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212. Where a partnership is involved, whether an activity is engaged in for profit is determined at the partnership level and not at the partner level. Brannen v. Commissioner, 78 T.C. 471, 505 (1982), affd. 722 F.2d 695 (11th Cir. 1984); Siegel v. Commissioner, 78 T.C. 659, 698 (1982). If a partnership activity is not engaged in for profit by the partnership, all partners are denied deductions affected by section 183. See Flowers v. Commissioner, 80 T.C. 914, 932 (1983); see also Brannen v. Commissioner, supra at 505. The determination that an activity is engaged in for profit is one of fact to be resolved on the basis of all the facts and circumstances. Flowers v. Commissioner, supra at 931-932. *194 A reasonable expectation of profit is not required as long as there is a bona fide objective to realize a profit. Golanty v. Commissioner, 72 T.C. 411, 425-426 (1979), affd. without published *316 opinion 647 F.2d 170 (9th Cir. 1981). Profit means economic profit, independent of tax savings. Landry v. Commissioner, 86 T.C. 1284, 1303 (1986). In determining the partnership intent, we have often focused on the actions taken by the promoters and general partners, including their intent, knowledge, conduct, expertise, and all other factors they relied upon in making decisions for the partnership. Surloff v. Commissioner, 81 T.C. 210, 233 (1983); Finoli v. Commissioner, 86 T.C. 697, 722 (1986); Brannen v. Commissioner, supra.However, this does not mean that our inquiry is confined solely to the activities of the partnership, "for those parties possessing resources sufficient to acquire and exploit investment property are not always blessed with corresponding expertise." Flowers v. Commissioner, supra at 932. The scope of the relevant inquiry therefore permeates *195 the entire transaction. Flowers v. Commissioner, supra at 932. But the profit objective issue must still be assessed from the perspective of the partnership. Flowers v. Commissioner, supra at 932. Petitioner bears the burden of proving the required profit objective. Welch v. Helvering, 290 U.S. 111, 115 (1933); Rule 142(a). Section 1.183-2(b), Income Tax Regs., sets forth several relevant factors which are to be considered in determining whether an activity is engaged in for profit. Among them are: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial *196 status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Objective facts are accorded greater weight than are mere statements of intent. Engdahl v. Commissioner, 72 T.C. 659, 666 (1979). No one factor is determinative of the taxpayer's objective to make a profit. Section 1.183-2(b), Income Tax Regs. However, a record of substantial losses over many years and the unlikelihood of achieving a profitable operation are important factors bearing on the taxpayer's true objective. Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967). As we stated in Bessenyey v. Commissioner, supra at 274: the presence of losses in the formative years of a business, * * * is not inconsistent with an intention to achieve a later profitable level of operation, bearing in mind, however, that the goal must be to realize a profit on the entire operation, which presupposes not only future net earnings but also sufficient net earning to recoup *197 the losses which have meanwhile been sustained in the intervening years. After a review of the record before us, we are convinced that Vemco did not enter into the mining activity with the objective to make a profit. Nor does it appear, for the reasons stated below, that the mining activity was potentially profitable because it is unlikely that it could "recoup the losses which have meanwhile been sustained in the intervening years." Bessenyey v. Commissioner, supra at 274. Vemco's decision to enter into the mining activity was ostensibly based on the $ 50,172.32 net calculated monthly profit projection contained in Ehrlinger's report. These profit projections assumed, inter alia, that an ore grade of 0.70 troy ounces of gold and 9.0 troy ounces of silver could be realized per ton of ore mined. However, the quality of ore grades used in these profit projections were inconsistent with the data that was available at the time the projections were made. The El Paso Chemical Laboratories report contained the results of the 12 ore samples. The results of these 12 samples indicated an average of 0.155 ounce of gold and 2.263 ounces of silver per ton of ore. Moreover, *198 the results of the six samples contained in Wilcox's report indicated per ton averages of 0.12 ounces of gold and 2.467 ounces of silver and 0.447 ounces of gold and 5.64 ounces of silver for Taonita and Tres de Mayo, respectively. Use of the samples' highest average ore grade values in Erhlinger's profit formula, all other values remaining constant including the assumed operating rate of 50 tons per day, results in a projected cash flow from the mining operations which falls short of even achieving/attaining the break-even point, much less a profit. The record also contains information concerning the mining activities for a period of 11 years, 1973-1983. Neither of the Mexican corporations ever paid a dividend to Vemco. Vemco reported losses in each and every of the 11 years for a total loss in the amount of $ 2,205,045.10. A record of such losses over so many years is persuasive evidence that Vemco did not possess the requisite objective of making a profit. Sec. 1.183-2(b)(6), Income Tax Regs.; Golanty v. Commissioner, supra at 427. The record also reveals that petitioner received a substantial annual income from sources unrelated *199 to the mining activity. Petitioner's ability to provide Vemco with continuous capital infusions was no doubt due to her *317 substantial annual income. But for the existence of petitioner's substantial annual income, neither petitioner nor Vemco could have sustained the perennial losses generated by the mining activity. See section 1.183-2(b)(8), Income Tax Regs.
Where a taxpayer procures, but fails to follow, the advice of experts, a lack of an objective to derive profit may be indicated unless it appears that the taxpayer is attempting to develop a different yet profitable technique. Section 1.183-2(b)(2), Income Tax Regs.
In their various reports, Weaver and Ehrlinger recommended that, in light of several factors including high transportation costs, a mill be installed at or near the site of the mine for a profitable and a more efficient operation overall. In fact, Ehrlinger's report contained only one profit projection which was based on an assumed operating rate of 50 tons per day. Ehrlinger's report also included blueprints and *200 estimated costs for a 50 ton capacity mill. This report, in which profits were forecasted, contained the only detailed projection of income, expenses and profits found in the record before us. Young testified that four tons per day was the maximum capacity of the mill that was actually employed in the mining operations and we find nothing in the record to indicate that a larger capacity mill was installed. It is apparent that Vemco's failure to implement Weaver's and Ehrlinger's recommendations for a larger capacity mill, which was the sole basis upon which we find profits were projected, severely hampered any chances of transforming the mining activity into a profitable operation. Vemco maintained books and records. However, based on the record before us, including the testimony of Carpenter, it is clear that Vemco maintained incomplete books and records inasmuch as Carpenter was unable to verify many of Vemco's claimed payments by tracing them back to a source document. See section 1.183-2(b)(1), Income Tax Regs.
We find it noteworthy that Young's testimony revealed that he has never operated a profitable mine. However, Weaver testified that, *201 in the past, he operated profitable mines located in Utah and Colorado, but not in Mexico. See section 1.183-2(b)(5), Income Tax Regs.
Weaver also testified that he was in charge of the day-to-day operations at the mining claims from 1973 until 1976 when, although the record is unclear on this point, it appears that Young became in charge of operations. We are mindful of the testimony of both Weaver and Young that they contributed time and effort to the mining operations. See section 1.183-2(b)(3), Income Tax Regs.
However, we find that, based on the facts shown by the record in this case, neither Vemco nor petitioner could have had a bona fide objective or reasonable prospect of making a profit out of the mining venture. Very little marketable gold or silver was mined or recovered over a period of at least five years (1973-1978), and yet few or no steps were taken to increase the production. Money may have been spent to improve the transportation of the ore from the mine to the market but little was done to bring ore to the surface for transportation. And very little was spent to increase or improve the crushing, separation *202 and cleaning process had the ore been mined. Under the circumstances we cannot find that petitioner or Vemco entertained an actual and honest objective of realizing a profit from the mining activities within the meaning of section 183(a). Based on the record we are at a loss to understand just what the objective of petitioner and Vemco was in throwing good money after bad into this project. We harbor a suspicion, however, that had petitioner not had a sizeable outside income and possibly no interest in spending her income in any other way, she would have taken a good hard look at the venture and would have been less willing to continue putting money into it just to keep it alive. We recognize that gold mining is a risky business and also that if it is successful it will pay off well, and that some people are willing to take the risk for the anticipated reward. But where, as here, efforts had been made to mine this property for years, according to the evidence, without sufficient production to report any income from mining, it would be a pipe dream to expect to make a profit without some change in circumstances, and there is no evidence that changes were made that would materially *203 increase production. On balance we find that neither Vemco nor petitioner entertained an actual and honest objective of realizing a profit from this mining venture for the years involved within the meaning of section 183(a). Moreover, to the extent that certain deductions claimed by petitioner, through Vemco, are not precluded by application of section 183, we nonetheless find that they are disallowed by virtue of their being the expenses of another taxpayer. It is a well-established principle of Federal tax law that a shareholder is precluded from deducting the expenses of a corporation of which it is a shareholder because the corporation and its shareholders are recognized as separate taxable entities. Deputy v. du Pont, 308 U.S. 488 (1940). Although it is true that Vemco's activities went beyond the passive holding of stock in the Mexican corporations this, in itself, does not form a sufficient basis *318 upon which we should disregard the corporate existence of the Mexican corporations. Rink v. Commissioner, 51 T.C. 746, 752 (1969). The record before *204 us reveals that the Mexican corporations had substance, that their existence was not a mere matter of form, and that they maintained a meaningful corporation/shareholder relationship with Vemco. Moreover, we have reviewed the character of the expenses which petitioner, through Vemco, claimed as deductions and find them to be those properly attributable to the Mexican corporations. But petitioner contends, for the first time in her reply brief, that the corporate entity should be disregarded inasmuch as the substance of the relationship between the Mexican corporations and Vemco was that of a joint venture. A joint venture is treated and taxable as a partnership for tax purposes under sections 761(a) and 7701(a)(2). See also section 1.761-1(a), Income Tax Regs.
In support of her joint venture contention, petitioner relies heavily upon Commissioner v. Bollinger, 485 U.S. 340 (1988). Generally, a corporation is regarded as a separate taxable entity even *205 if it has only one shareholder who exercises total control over its affairs. Moline Properties v. Commissioner, 319 U.S. 436 (1943). But where a corporation is acting as the agent of its shareholder, the separate entities of corporation and shareholder may be disregarded for Federal tax purposes because the law attributes tax consequences of property held by a genuine agent to the principal. Commissioner v. Bollinger, supra.The three-part test to be used in determining whether a corporation is a true agent of its shareholder is (1) whether the fact that the corporation is acting as an agent with respect to a particular asset is set forth in a written agreement at the time the asset is acquired; (2) whether the corporation functions as agent and not as principal with respect to the asset for all purposes; and (3) whether the corporation is held out as the agent and not as the principal in dealings with third parties relating to the asset. See George v. Commissioner, 844 F.2d 225, 228-229 (5th Cir. 1988), affg. a Memorandum Opinion of this Court. After a review of the record before us, we find that petitioner has failed *206 to satisfy each part of the three-part Bollinger test. Therefore, Vemco's relationship vis-a-vis each of the Mexican corporations was not one of principal/agent. Thus, the amounts are not deductible by petitioner, through Vemco, because as a shareholder Vemco is not entitled to pay and claim a deduction for expenditures properly attributable to the Mexican corporations. See Koree v. Commissioner, 40 T.C. 961, 965-966 (1963). Instead, we agree with respondent's position that petitioner "is no doubt entitled [to] additional basis in her allocable share of the corporate stock attributable to the payment of" amounts that "* * * were related to corporate business and deductible by the corporation * * *" In view of the foregoing, we find it unnecessary to address the remaining issues raised by the parties, save the inventory issue discussed below, because they are rendered moot. Inventory Issue
Whether the application of section 482 reduces Vemco's (and petitioner's distributive share of) claimed inventory loss to zero for the taxable year 1976. Section 482 *207 allows respondent to allocate between any two or more controlled organizations, trades, or businesses, gross income, deductions, credits, or allowances if respondent determines that such allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any such organizations, trades, or businesses. "Controlled" is defined in sweeping terms so as to include any type of control, direct or indirect, whether legally enforceable, and however exercisable or exercised. Section 1.482-1(a)(3), Income Tax Regs. It is the reality of the control which is decisive, not its form or the mode of its exercise. Petitioner owned a majority interest in both Cannon Aero and Vemco. Petitioner exerted financial control over each organization. Based on the record before us, it is abundantly clear that petitioner controlled both Cannon Aero and Vemco within the meaning of section 482. In his notice of deficiency, respondent determined that a $ 12,600 date of acquisition fair market value should be allocated to the inventory assets. Petitioner has the burden of proving that respondent's determination is erroneous. Welch v. Helvering, supra; *208 Rule 142(a). Therefore, in order to prevail, petitioner must prove that either the date of acquisition fair market value of the inventory assets was more than $ 12,600 to justify a writedown in 1976 or that respondent's determination under section 482 was unreasonable, arbitrary, or capricious. Ach v. Commissioner, 42 T.C. 114, 126 (1964), affd. 358 F.2d 342 (6th Cir. 1966), cert. denied 385 U.S. 899 (1966). Petitioner has conceded that the inventory became obsolete prior to the time petitioner transferred the inventory to Vemco. There is nothing in the record before us indicating that the inventory was worth more than $ 12,600 at the beginning of the year 1976. The inventory *319 loss was properly disallowed inasmuch as any allowable loss that might have been claimed was properly that of Cannon Aero and not that of Vemco. Petitioner has clearly failed to carry her burden of proof, and therefore, respondent's disallowance of petitioner's claimed cost of goods sold in the amount of $ 42,250 must be sustained. Decision will be entered for the respondent. Footnotes
1. This case was assigned and deemed submitted to Judge Drennen↩ by order dated June 6, 1989.
2. All Rule references are to the Tax Court Rules of Practice and Procedure. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years at issue.↩