T.C. Memo. 2009-175


UNITED STATES TAX COURT


CANTERBURY HOLDINGS, LLC, CHRISTOPHER B. AND SUSAN L. WOODWARD,
PARTNERS OTHER THAN THE TAX MATTERS PARTNER, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

CANTERBURY HOLDINGS, LLC, CHRISTOPHER B. WOODWARD, TAX MATTERS
PARTNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE,
Respondent


Docket Nos. 17064-04, 14580-06.    Filed July 27, 2009.


Charles P. Rettig, Edward M. Robbins, Jr., and David Roth,
for petitioners.

Margaret A. Martin, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


HOLMES, Judge:  Christopher Woodward, David Teece, and
Kenneth Klopp were partners in Canterbury Holdings, LLC.

Canterbury mounted a takeover of an old New Zealand clothing company in 1999.  Its ride turned rough, and the shell company that Canterbury was using had to pony up more money in 2000 and 2001 to make the deal go through.  That money actually came from Canterbury itself, but Canterbury argues that these payments are deductible nonetheless.  The Commissioner disagrees, and would also saddle Canterbury's partners with an accuracy-related penalty.

## FINDINGS OF FACT

Woodward and his partners formed Canterbury in 1999 as a limited liability company.[1]  Teece held by far the biggest share: At the end of 2001, he owned 89 percent; and Woodward, Klopp, Woodward's Keogh plan,[2] and a family trust owned the rest.[3]

---

[1] Although the first domestic limited liability company (LLC) was created in 1977 in Wyoming, the rise of the LLC as a widespread tax-saving entity is relatively new.  The LLC offers the best of both worlds--the limited liability of a corporation and the favorable tax treatment of a partnership.  See Hamill, "The Story of LLCs: Combining the Best Features of a Flawed Business Tax Structure", in Business Tax Stories: An In-Depth Look At Ten Leading Developments In Corporate and Partnership Taxation (Bank & Stark, eds., Foundation Press, 2005).

[2] A Keogh plan is an income-tax-deferred qualified pension plan for the self-employed or those who are owner-employees of unincorporated businesses.

[3] The initial percentages of ownership among the members was slightly different, and by the end of 2001 the family trust no longer had an interest.  And although Canterbury is an LLC whose owners are called "members" under state law, both parties agree

(continued...)

Teece was a New Zealander with extensive business experience; Woodward was an investment banker; and Klopp was the founder of North Face, the successful sports-apparel company. The partners planned to buy undervalued companies in the sports-apparel industry and work at restoring their profitability.

Canterbury shared its name with a 104-year-old brand that sponsored the world's top rugby teams--including the famed New Zealand national team, the All Blacks. Woodward and his partners thought they saw hidden value in the brand. Its owner, LWR Industries, Ltd., had higher costs than other apparel companies because it continued to manufacture the goods it sold. With liberalized world-trade rules coming into effect, and

---

[3](...continued)
that Canterbury is a TEFRA partnership under the Code. (TEFRA is the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324, one part of which governs the tax treatment and audit procedures for most partnerships. See TEFRA secs. 401-406, 96 Stat. 648. TEFRA requires the uniform treatment of all "partnership items"--a term defined by section 6231(a)(3) and (4)--and its general goal is to treat all partners alike when the IRS adjusts partnership items. Each TEFRA partnership is supposed to designate one of its partners as TMP--tax matters partner--to handle TEFRA issues and litigation for the partnership. (Woodward is Canterbury's TMP.)) Congress frequently amends TEFRA, but all the section references in this opinion are to the Internal Revenue Code and regulations as in effect for years in issue. The one reference to a Rule is to the Tax Court's Rules of Practice and Procedure.

globalization encouraging the migration of manufacturing, it seemed to the partners that they could make the brand more profitable by taking production offshore of New Zealand and shifting LWR's focus to marketing and sales.  But taking over LWR meant aiming at two targets:  BIL (NZ Holdings), Ltd. and the New Zealand public, because BIL owned about two-thirds of LWR's stock and the rest was held and publicly traded on New Zealand's stock exchange.

The partners knew that BIL was interested in selling LWR-- BIL itself was an extremely large company by New Zealand standards, and its management thought its own portfolio of businesses featured many with stronger growth prospects than an old clothing company could possibly provide.  BIL's commanding ownership also meant a hostile takeover was out of the question.  So the partners approached BIL for a friendly deal, and quickly came to terms.  Canterbury would take two steps:  The first would be a tender offer for the 34 percent of LWR's shares held by the New Zealand public.  And, if that worked, LWR would be delisted and Canterbury would buy the remaining shares from BIL.

Canterbury then formed a New Zealand corporation, dubbed Canterbury Holdings, Ltd., New Zealand (Canterbury NZ), and made it a wholly owned subsidiary.  Canterbury's partners meant Canterbury NZ to be a shell whose only purpose was to acquire and

hold LWR stock.  Making their shell corporation a New Zealand company was important to the deal--the partners feared a wholly foreign deal would spur negative public reaction to the expected sale of an iconic New Zealand brand.  The partners also thought it would help the deal survive New Zealand's own legal obstacles to overseas investment in existing New Zealand businesses.

The deal took off in late May 1999, when BIL granted Canterbury NZ an option to buy BIL's 66-percent stake in LWR. That same day, BIL and Canterbury NZ also signed a Memorandum of Understanding.  The Memorandum provided that Canterbury NZ would be capitalized by its shareholders to NZ$ 10 million[4] to buy the publicly held shares of LWR.  If the tender offer were to exceed NZ$ 10 million, BIL promised to lend the necessary funds to Canterbury NZ for one year.  Canterbury NZ's LWR stock would secure the loan.

With financing in hand, Canterbury NZ announced its offer and by October 1999 almost all the publicly held stock had been tendered.  Canterbury capitalized Canterbury NZ by wiring NZ$ 10

---

[4] Throughout this opinion we specifically identify amounts stated in New Zealand dollars (NZ$).  All our other mentions of amounts are in U.S. dollars.  During 1999, the New Zealand dollar traded at an average of 0.5294 per U.S. dollar.  It weakened to an average of 0.4568 the next year.  See Federal Foreign Reserve Statistical Release, Foreign Exchange Rates (Annual) (Jan. 8, 2001) available at: http://www.federalreserve.gov/releases/g5a/20010109/.

million to it in exchange for 10 million Canterbury NZ shares. At the time, these Canterbury NZ shares were Canterbury's only significant asset.

Owning one-third of LWR's shares and holding an option for the rest, Canterbury NZ effectively controlled LWR. But the partners knew that they could not take over LWR's management all at once. To ensure a smooth transition, Canterbury NZ signed a Joint Interest Agreement with BIL. Under its terms, Canterbury NZ would share management of LWR with BIL until it exercised the option. But BIL was not volunteering its time. The Joint Interest Agreement provided that LWR would pay for BIL's services, and the amount LWR would pay was set--somewhat curiously--as a percentage of the price Canterbury NZ had agreed to pay for BIL's LWR stock: 5 percent (plus GST) for the first year and 17.5 percent plus GST for a second year.[5] This worked out (in U.S. currency) to $500,000 the first year and $1,750,000 for the second. Canterbury NZ guaranteed LWR's obligation to BIL; but with its capital all spent on acquiring LWR stock through the public tender offer, could not possibly back that guaranty if LWR faltered. Everyone involved understood (and we so find) that it was Canterbury's partners who were actually

---

[5] GST is the goods and services tax, New Zealand's value-added tax.

guaranteeing LWR's obligation to pay the fees to BIL by promising to inject capital into Canterbury NZ if necessary to complete the transaction.

BIL was not alone in charging LWR during this transition period. The Agreement also let Canterbury NZ charge LWR for its services. If the transition ran into a second year, LWR would pay Canterbury NZ 7.5 percent of the call price plus GST--about $750,000. Canterbury NZ had a strong incentive to exercise the option quickly, because the Agreement allowed these management fees to be reduced ratably if Canterbury NZ exercised the option sooner than the end of the two-year transition.

After signing the Joint Agreement, Canterbury's partners took up positions in Canterbury NZ, and Canterbury NZ also paid Canterbury for their services. Canterbury in turn distributed the money to the partners as wages. LWR also paid Canterbury's partners directly as contractors.

So the cash was flowing reasonably well, both directly and indirectly, from LWR to the partners. But the cashflow to BIL dried up. Despite the express terms of the Joint Agreement, BIL was not getting paid for its management services to LWR. BIL noticed and sent a letter to LWR in October 2000 reminding it that management fees were due November 8, 2000. Teece responded on behalf of Canterbury with a complaint that BIL had

misrepresented LWR's financial situation before signing the Joint Agreement, making LWR unable to fund the payments. The same letter was sent to BIL from Canterbury NZ.

BIL, though, was eager to unhitch itself from LWR, and proved willing to renegotiate both the Joint Agreement and the call option. The changes were very much to Canterbury's advantage--the option price was marked down from NZ$ 22.7 million to only NZ$ 6.25 million. And to settle the dispute over management fees, BIL agreed to accept NZ$ 4,010,000 as payment in full. And here we come to the first expense whose deductibility we must analyze: Canterbury NZ, though it was the entity that owed BIL the management fees, wasn't the entity that paid it. Instead, Canterbury itself paid BIL directly. Canterbury converted these payments to U.S. currency and deducted them on its 2000 and 2001 returns.

With these new arrangements in place, Canterbury NZ exercised its option and paid BIL NZ$ 6,250,000 for its LWR shares on May 10, 2001. Of this sum, NZ$ 1,250,000 was paid to BIL at closing, leaving a balance of NZ$ 5 million subject to a mortgage of securities. The interest on this remaining NZ$ 5 million debt was unusual as well. The NZ$ 5 million principal was not owed until late 2004, with no further interest owed unless Canterbury NZ failed to pay. And Canterbury NZ allegedly

assigned this debt to Canterbury itself, though the assignment wasn't reflected on the books of either firm until 2003. But whatever was paid and owed, and by whom, the compromise worked: BIL withdrew its managers and LWR hired others to replace them.

The Commissioner audited Canterbury's returns and issued notices of final partnership administrative adjustment for 2000 and 2001 denying Canterbury's deductions for management fees and interest.[6] He also asserted penalties under section 6662. We tried the case in San Francisco--Canterbury had its principal place of business in California when it filed its petition.

OPINION

I. Deductibility of Expenses Paid

As a general rule, shareholders who pay their corporation's expenses don't get a deduction--the Code treats them as investors, not as engaged in their corporation's trade or business themselves. Betson v. Commissioner, 802 F.2d 365, 368 (9th Cir. 1986), affg. in part and revg. in part T.C. Memo. 1984-264; Grauman v. Commissioner, 357 F.2d 504, 505-06 (9th Cir. 1966), affg. T.C. Memo. 1964-226; Madden v. Commissioner, T.C. Memo. 1980-350. The Code and regulations usually treat such expenditures as loans or capital contributions. Sec. 263;

---

[6] An FPAA, as a notice of final partnership administrative adjustments is abbreviated, is the TEFRA equivalent of a notice of deficiency, in that it triggers the start of the time for filing a case in Tax Court.

sec. 1.263(a)-2(f), Income Tax Regs. (voluntary contributions by shareholder for any corporate purpose are nondeductible capital expenditure); see also Betson, 802 F.2d at 368. Canterbury's payments on behalf of Canterbury NZ, therefore, look like they would fall within this general rule and be considered nondeductible loans or capital contributions.

Canterbury understands this, but invokes an exception. Section 162 permits deductibility of "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." And there's nothing in the Code that bars a shareholder from deducting payments of his corporation's expenses, if those expenses are also ordinary and necessary to *his own* trade or business. Lohrke v. Commissioner, 48 T.C. 679, 688-89 (1967).

The main question thus amounts to which of two groups of cases is a better fit for the facts before us. The rules are a little bit different for the management fees and the interest deductions, and we examine them separately. But there are a great number of cases in this area, and very little custom tailoring is needed.

A. Management Fees

Lohrke is the key case in the field, summarizing the exception to the general rule of nondeductibility to require that

a shareholder who wants a deduction for paying his corporation's expenses must show two things: (1) that his purpose was to protect or promote his own business, and (2) that the expenses paid were ordinary and necessary to that business. Id. at 688.

The problem is that Canterbury itself didn't benefit directly from BIL's management of LWR. LWR received the services, but Canterbury itself looks like it benefited only indirectly--the services presumably improved LWR's value, which presumably increased the value of Canterbury NZ's LWR stock and option to buy more, which presumably increased the value of Canterbury's Canterbury NZ stock. Recognizing that this would make payment of the fees look more like a capital transaction, Canterbury argues instead that the fees were also "ordinary and necessary" to its own business because their payment protected its own reputation and credit, and thus promoted its own business. This argument has persuaded us in the past--Canterbury cites Coulter Elecs., Inc. v. Commissioner, T.C. Memo. 1990-186, affd. without published opinion 943 F.2d 1318 (11th Cir. 1991), where we allowed a parent company to deduct reimbursements made to a wholly owned Canadian subsidiary for the cost of warranty services because those services would affect the parent's sales and its own business reputation. See also Lutz v. Commissioner, 282 F.2d 614 (5th Cir. 1960), revg. T.C. Memo. 1959-32; Dinardo

12

v. Commissioner, 22 T.C. 430 (1954); Scruggs-Vandervoort-Barney, Inc. v. Commissioner, 7 T.C. 779 (1946). And, of course, there is the landmark case of Jenkins v. Commissioner, T.C. Memo. 1983-667, where we waxed lyrical on (and found deductible) Conway Twitty's payments of corporate debt to protect his own reputation.

But we have to agree with the Commissioner that Canterbury runs into a snag in trying to fit itself into this line of cases. In cases where we've allowed a deduction to an owner who has paid his company's expenses, the owner himself had an independent operating business or, in the case of Conway Twitty, a high-profile reputation requiring the good will of the public to sustain sales. Such payors have a longstanding reputation separate from that of their subsidiary. See Dinardo, 22 T.C. at 431-32 (20 years of practicing medicine); Scruggs-Vandervoort-Barney, 7 T.C. at 780-81 (35 years of running a department store); Coulter Electronics, T.C. Memo. 1990-186 (two decades of manufacturing advanced medical equipment).

What we look for here is therefore Canterbury's ability to otherwise promote *its own business wholly apart* from that of its subsidiary. The Commissioner stipulated that Canterbury's general business was to acquire, manage, and turn around distressed companies, but the parties also stipulated into

evidence the Operating Agreement of Canterbury's partners. Its specific terms restricted Canterbury's business activity to the investment in LWR. Article 2.7 of the partners' Operating Agreement is seamless evidence of this:

> Without the unanimous consent of the Voting Members [i.e., the three partners], the Company may not engage in any business other than the following:
>
> A. directly or indirectly managing and disposing of LWR and the assets thereof;
>
> B. purchasing real or personal property, making investments, and * * * other business activities proposed by the Board of Managers in connection with enhancing the value of LWR and not prohibited by law or this Agreement;
>
> C. engaging in any other activities directly related to LWR * * * to further the foregoing business; and
>
> D. ultimately realizing the value and distributing the proceeds from the foregoing.

The Operating Agreement also defined certain events, including a partner's termination of employment at LWR, as a termination of his voting membership in Canterbury.

Woodward credibly testified that, even as the problems at LWR took ever larger amounts of the partners' time, Canterbury at least nosed around the possibility of doing other deals. But we specifically find that, during the years at issue here, Canterbury itself had no actual business apart from stitching

together a deal for, and then managing, LWR. Although Canterbury indicates that by working with BIL, it hoped to get a "foot in the door" promoting its consulting business in New Zealand, and while it describes dire consequences to its reputation had it not paid the fees to BIL, Canterbury did not have already operating business, credit standing, or a preexisting reputation to maintain. Its desire to build a future reputation is simply not enough for us to grant its current deductions as "protecting and promoting its trade or business."

The Ninth Circuit has also long recognized that a more direct connection with an existing business is needed to sustain a deduction in this area. When a doctor tried to deduct his payments to the family pet store's creditors as a business expense of his medical practice, our denial of the deduction was affirmed:

> While community disapproval might well be expected to follow from one's failure to recognize moral responsibility for a debt owing to an impoverished widow, it would not, in our judgment, necessarily result from failure to assume responsibility for such impersonal matters as taxes, utility charges or debts to distant creditors. * * *

Grauman v. Commissioner, 357 F.2d at 505-06.

We therefore find that the management fees were capital investments and not deductible expenses. Those payments by Canterbury were not ordinary and necessary expenses of its own

business, but aimed only at protecting the value of the LWR stock that Canterbury NZ already owned, as well as its ability to buy the rest from BIL.

Canterbury thus fails the first part of the Lohrke test. If that were all, we'd have no problem denying the deduction of the management fees. But perhaps recognizing the poor fit of this first argument, Canterbury dons a second--that Canterbury NZ was a nominee whose separate existence we should ignore. Canterbury NZ was certainly not an independent subsidiary with a business of its own. It had no assets, no employees, and all of the business was that of Canterbury. Its funds were all provided by Canterbury, and all its management decisions and services were Canterbury's alone. It was Canterbury's partners who performed management services for LWR on behalf of Canterbury NZ, and it was they who were paid for them. Canterbury orally guaranteed Canterbury NZ's obligations to BIL. Despite the names on the documents, BIL always looked to Canterbury for payment, because BIL was aware that Canterbury NZ had no independent means of payment and was just an acquisition vehicle.

There is some force, then, in Canterbury's assertion that Canterbury NZ was no more than a disregarded or deemed nominee of Canterbury holding passive title to LWR shares, or maybe an agent for Canterbury's business purpose. But being a shell corporation

is not synonymous with being a nominee or an agent.  Unlike the nominee corporation analyzed in Paymer v. Commissioner, 150 F.2d 334, 337 (2d Cir. 1945), Canterbury NZ was not a mere "passive dummy."  We cannot say that it "served no business purpose . . . and was intended to serve only as a blind to deter the creditors of one of the partners."  Id.

We likewise find no merit in Canterbury's argument that Canterbury NZ was its agent.  A corporation can, of course, be an agent--no one would say that a customer of Western Union is making a capital contribution when he gives it money to wire abroad.  But "if the corporation is a true agent, its relations with its principal must not be dependent upon the fact that it is owned by the principal."  Natl. Carbide Corp. v. Commissioner, 336 U.S. 422, 437 (1949).  Canterbury NZ's relations with Canterbury, in obvious contrast, were wholly dependent on its ownership by Canterbury--it was useful simply by being a New Zealand presence for the deal to take over LWR, and conducted business in its own name as a coowner of LWR throughout the years in issue.  There was no agency agreement between Canterbury and Canterbury NZ, and Canterbury at no time identified Canterbury NZ to BIL as anything other than its subsidiary.  Cf. Commissioner v. Bollinger, 485 U.S. 340, 349-50 (1988).

The Code and caselaw simply do not allow Canterbury to ignore its organizational choices when convenient for tax purposes. Higgins v. Smith, 308 U.S. 473, 477 (1940); Grothues v. Commissioner, T.C. Memo. 2002-287. It was Canterbury NZ that made the tender offer to the New Zealand public, and it was Canterbury NZ that appeared on all letterheads and correspondence and agreements with BIL. Canterbury's change of heart in treating its subsidiary as merely its agent or nominee is also contrary to the position it took in its 1999 tax return, where Canterbury listed the capital contributions made to Canterbury NZ as a capital asset and Canterbury NZ itself as an investment. It then reported the payments received from Canterbury NZ for the partners' services as income and deducted amounts paid to the partners as wages and salaries.

It is something of a puzzle why Canterbury capitalized Canterbury NZ for the first stage of the takeover plan but then didn't do so again when Canterbury NZ needed more money to pay its obligations to BIL. The only solution the record supports is that by that time Canterbury (or more precisely its partners) had more use for the deductions than did Canterbury NZ. But even if we're wrong about that, another one of the old general principles of corporate tax law still fits: "[W]hile a taxpayer is free to organize his affairs as he chooses, nevertheless, once having

done so, he must accept the tax consequences of his choice." Commissioner v. Natl. Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 149 (1974).

The expense of acquiring a capital asset generally is not currently deductible. By its own admission, Canterbury claims that it paid the management fees to salvage and preserve a potentially deteriorating relationship with BIL. Canterbury's payment to BIL should therefore not be viewed in isolation. When Canterbury made the payment on December 12, 2000, Canterbury NZ already had a 34-percent interest in LWR from the successful tender offer and it wanted the rest. So we find that Canterbury's payment of management fees primarily enhanced the value of its indirect investment in LWR. We therefore agree with Commissioner and find that the payments made by Canterbury to BIL were directly tied to the purchase of the LWR shares, a separate and distinct asset, and therefore a capital expenditure. They were not an ordinary and necessary expense of Canterbury's own trade or business.

Our finding on this point is also supported by some evidence that Canterbury and Canterbury NZ themselves described these "management fees" as repayment of a loan. When Teece responded to BIL's demand letter for management fees, he described them as "requesting the loan" and noted that "it was always contemplated

that the source of the funds for repayments of <u>any advances</u> made by BIL to [Canterbury NZ] was to be from funds made available from LWR." Teece continued that since LWR's financial affairs were worse than presented to them, "LWR is unable to fund the payments under <u>the loan</u> due on 8 November." He went on in his letter to request an extension of the repayment date and promised to repay the outstanding balance of about NZ$ 2.8 million by May 8, 2001, reminding BIL it held a mortgage of LWR shares secured for this repayment <u>of loan</u>.

Similarly, when Canterbury NZ repeated its allegations that BIL had lied about LWR's financial condition, it said that LWR was unable to fund the repayment of <u>the loans</u> due on November 8, 2001, citing section 5.1 of an October 1999 Memorandum of Understanding. Neither party offered that memorandum into evidence, but we do have an earlier version from May 29, 1999. This version of the Memorandum Agreement mentions a loan BIL would advance to Canterbury NZ if the tender offer required more than NZ$ 10 million to close. The loan would bear 7.2 percent interest. We don't have to decide from this sketchy evidence whether the management fees are not deductible because they are in fact a repayment of loan principal, but we do think it saps

strength from Canterbury's argument that what it paid to BIL was an ordinary and necessary expense of its own business rather than part of acquiring a capital asset.

The management fees at issue here are best seen as part of the whole transaction of the purchase of LWR by Canterbury NZ, and we therefore find that they should be treated as capital contributions.

B.  <u>Interest Expenses</u>

Section 163 allows a deduction for interest on indebtedness paid or accrued within the taxable year.  Canterbury claimed a deduction for interest paid in 2001 according to the Agreement for Sale and Purchase of Shares that closed on May 10, 2001.  But this Agreement required Canterbury NZ, not its American parent, to pay BIL for its LWR stock.  The loan also had curious terms-- BIL agreed to lend NZ$ 5 million to Canterbury NZ, subject to the terms of another agreement, which the parties called the Facility Agreement.  The Facility Agreement did not provide for any interest to be due unless repayment of the NZ$ 5 million was not made by June 30, 2004.  Although the NZ$ 5 million was paid in 2003 before the loan's due date, Canterbury presented at trial an assignment-of-interest agreement between BIL and Canterbury stating that Canterbury would assume Canterbury NZ's obligation

to pay BIL interest of NZ$ 2,250,000 for the period of May 10, 2001 through June 30, 2004.

According to credible testimony, this money wasn't actually paid and was perhaps deducted from the principal that was repaid later on--though even this is unclear. Canterbury nevertheless reported this amount as its own interest expense on its tax return. The Commissioner denied the deduction because he concluded the indebtedness was not Canterbury's but Canterbury NZ's. We agree.

As with the management fees, Canterbury argues once again that the interest payments were essential to promoting and protecting its trade or business. We reject this argument for the same reasons we rejected it already with regard to the management fees. Furthermore, we find that it was part of the deal that enabled Canterbury NZ to acquire all of LWR's shares.[7] Although Canterbury claims the loan was assigned to it by Canterbury NZ, there was no such document between Canterbury and Canterbury NZ admitted into evidence. The record does include an Agreement between BIL and Canterbury for Canterbury to pay BIL

---

[7] We also note interest incurred on property held for investment is "investment interest". Sec. 163(d)(3)(A). Section 163(d)(1) limits the deductibility of investment income of a noncorporate taxpayer to the amount of net investment income (excess of investment income over investment expenses.) Sec. 163(d)(2). Canterbury reported only trivial investment income on its 2000-01 returns, and it could not claim investment-interest deductions above those amounts.

22

NZ$ 2,250,000 in interest.  But only Canterbury signed it, and some important blank spaces in the Agreement--especially the one to record the date of the assignment to Canterbury of the loan between Canterbury NZ and BIL--remain unfilled.

We therefore agree with the Commissioner that there was no reason for Canterbury, as part of its own trade or business, to assume Canterbury NZ's obligation.  This isn't to say that Canterbury lacked any reason to pay this debt.  We recognized in a similar case that

> a successful operation of the foreign subsidiary * * * would obviously inure to the benefit of the petitioner as parent corporation.  Petitioner's willingness to undertake this obligation is understandable.  But we do not believe that these dollar payments of salaries and related payments can be construed as petitioner's own business expense as a part of its cost of goods sold.

Columbian Rope Co. v. Commissioner, 42 T.C. 800, 815-16 (1964).  We have no reason to decide this case differently.  A corporation generally is a separate taxable entity even if it has only one shareholder who exercises total control over its affairs.  Moline Props., Inc. v. Commissioner, 319 U.S. 436, 439 (1943).

II.  Accuracy-Related Penalty

Section 6662 imposes a penalty on underpayments attributable to gross valuation misstatements, negligence, or a substantial understatement of income tax.  In this case, the Commissioner asserted the penalty on two grounds: negligence for the deduction

of interest, and substantial understatement of income tax for the deduction of the management fees.[8]  Both of these grounds for imposing the penalty are subject to the defense of reasonable good-faith reliance on professional advice.  Sec. 6664(c)(1); see also sec. 1.6664-4(a), Income Tax Regs.; Higbee v. Commissioner, 116 T.C. 438, 448 (2001).

Canterbury argues that it relied on the professional advice of one Max Gray.  Gray is a CPA and attorney with more than 40 years of experience as a tax consultant.  He was also a KPMG partner.  We have no doubt that he is a competent professional in his field--in addition to his experience, his education was also top-of-the-line.  He has a B.S. in accounting and finance, an M.A. from Berkeley, and a J.D. from the University of San Francisco.  While in law school, Gray began to work on the audit staff of KPMG, and climbed his way up to be a member of the tax department, until he made partner in 1973.  While working for KPMG, he even taught tax courses at California State University, Hayward (now called California State University, East Bay).  And though he had already retired from KPMG when he was advising Canterbury, he still had a private practice.

---

[8] TEFRA tells us that we should usually examine any accuracy-related penalties or additions to tax related to adjustments to partnership items at the partnership level.  New Millennium Trading, LLC v. Commissioner, 131 T.C. ___, ___ (2008) (slip op. at 8-10); Tigers Eye Trading, LLC v. Commissioner, T.C. Memo. 2009-121.

Woodward and Teece called Gray in 2000 and asked for his advice on the U.S. tax consequences of their New Zealand acquisition. Canterbury supplied Gray with all the relevant documentation including its draft tax returns for the 2000 and 2001 tax years and consulted with him on the proper character and reporting of the management fees and interest expenses paid by Canterbury to BIL. Canterbury thereafter followed Gray's advice.

Though we disagree with Gray on the merits of this case, we find that Canterbury reasonably relied in good faith on his advice. That is enough to free Canterbury of liability for the penalties.[9] When an accountant or attorney advises a taxpayer on a matter of tax law, it is reasonable for the taxpayer to rely on that advice. <u>United States v. Boyle</u>, 469 U.S. 241, 251 (1985).

<u>Decisions will be entered</u>

<u>under Rule 155.</u>

---

[9] The partners' reasonable reliance on Gray's advice is also enough to refute the Commissioner's new theory that Canterbury was a tax shelter under section 6662(d)(2)(C) that disguised the real relationship of the deductions to the partners. This rather startling argument would require us to find that the purpose the partners had in forming the LLC was to enable themselves to deduct the management fees and interest expenses. This is too much--everything in the record supports Canterbury's position that its partners formed the LLC and created Canterbury NZ for the perfectly understandable and profit-motivated purpose of acquiring and rehabilitating the Canterbury brand, not evasion or avoidance of federal income tax.